IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


WILDLAW, et al.,              )
                             )
     Plaintiffs,             )
                             )        CIVIL ACTION NO.
     v.                      )        2:03cv682-MHT
                             )            (WO)
UNITED STATES FOREST         )
SERVICE, et al.,             )
                             )
     Defendants.             )

OPINION

Plaintiffs Wildlaw et al. (collectively referred to as Wildlaw),[1] a group of 18 environmental coalitions and nonprofit organizations from around the country, have brought this suit against defendants United States Forest

_____

1.  The plaintiffs are Wildlaw; Wild South; Wild Alabama; Save America's Forests; Save Our Big Scrub, Inc.; Superior Wilderness Action Network; Utah Environmental Congress; Southern Appalachian Biodiversity Project; Appalachian Voices; Virginia Forest Watch; Shenandoah Ecosystems Defense Group; Idaho Sporting Congress; Environmental Protection Information Center; Forest Guardians; Alabama Environmental Council; Southern Appalachian Forest Coalition; Cherokee Forest Voices; and South Carolina Forest Watch.

Service et al. (collectively referred to as the Forest Service).[2]  In an 11-count complaint, Wildlaw challenges the validity of three sets of regulations promulgated by the Forest Service in 2003.  The Forest Service denies that the regulations are invalid and also argues that Wildlaw lacks standing and that its claims are not ripe for adjudication.

Jurisdiction is proper under 28 U.S.C. § 1331, and this cause of action arises under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.  The parties have agreed to forgo summary-judgment proceedings as well as trial; this case is now under final submission for a

_____

2.  The defendants are the Forest Service and the Department of Agriculture and the following individuals named in their official capacities:  Ann M. Veneman, Secretary of Agriculture; Mark E. Rey, Under Secretary of Agriculture for Natural Resources and Environment; and Dale Bosworth, Chief of the United States Forest Service. The court, having taken judicial notice that Veneman is no longer Secretary of Agriculture, has entered an order pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure substituting Mike Johanns.

The Forest Service is an agency of the Department of Agriculture.

decision on the basis of the administrative records and briefs filed with the court.   For the reasons that follow, the court finds in favor of the Forest Service.

## I. FACTUAL BACKGROUND

### A. The Healthy Forests Initiative

In August 2002, the President of the United States unveiled his Healthy Forests Initiative, a program designed to confront "a crisis of deteriorating forest and rangeland health, the result of a century of well-intentioned but misguided land management."   Healthy Forests: An Initiative for Wildfire Prevention and Stronger Communities 1 (2002), available at http://www.whitehouse.gov/infocus/healthyforests/Health y_Forests_v2.pdf.   According to the President's report, "[n]atural, low-intensity fires" contribute to forest health by "reducing the buildup of fuels," thereby reducing vulnerability to severe fires.   Id.   Due to the government's over-suppression of wildfires in the past,

forests had become "unnaturally dense" and "overloaded with fuels," significantly increasing the risk of catastrophic wildfires.  <u>Id</u>.  The Healthy Forests Initiative was designed to restore American forests to health.

In addition to detailing this new substantive policy goal of enhancing forest health by removing fuels and reducing the risk of catastrophic wildfires, the President's report identified "considerable administrative delays" preventing the government from efficiently addressing the forest crisis.  <u>Id</u>. at 13; <u>see also</u> The Process Predicament: How Statutory, Regulatory, and Administrative Factors Affect National Forest Management 15 (2002) ("Procedural constraints keep national forest management from being as efficient and effective as it should be."), <u>available at</u> http://www.fs.fed.us/projects/documents/Process-Predicament.pdf.  A significant part of the Healthy Forests Initiative was therefore dedicated to reducing the

procedural and administrative burdens associated with regulating our Nation's forests.  <u>See</u> Healthy Forests at 3 ("President Bush is directing Agriculture Secretary Veneman, Interior Secretary Norton and Council on Environmental Quality Chairman Connaughton to improve <u>regulatory processes</u> to ensure more timely decisions, greater efficiency, and better results in reducing the risk of catastrophic wildfires by restoring forest health." (emphasis added)).

## B. Categorical Exclusions

One significant procedural change available to the Forest Service in furtherance of the Healthy Forests Initiative was the adoption of new categories of agency actions to be excluded from documentation under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321-4370f.  To place the concept of categorical exclusion in context, a brief description of

NEPA is appropriate. A description of the so-called 'categorical exclusions' follows.

### 1. NEPA and the Concept of Categorical Exclusion

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1. Among other things, NEPA requires that federal agencies prepare a detailed report, known as an environmental impact statement (EIS), for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "NEPA does not work by mandating that agencies achieve particular substantive environmental results. Rather, NEPA promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action." Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371 (1989) (quoting 42 U.S.C. § 4321).

Pursuant to NEPA, the Council on Environmental Quality has promulgated a complex array of regulations, some of which govern the procedures a federal agency must follow to determine whether an agency action is one that requires the preparation of an EIS.  See generally 40 C.F.R. pts. 1500-1508.  There are generally two ways a federal agency can act without preparing an EIS.  See 40 C.F.R. § 1501.4.  First, the agency can prepare a shorter document, known as an environmental assessment (EA), and, based on the EA's conclusion that the action will not significantly affect the human environment, issue a "finding of no significant impact."  Id. §§ 1508.9, 1508.13.  Second, because the preparation of an EA is itself time-consuming and burdensome, an agency can identify a class of actions, known as a categorical exclusion (CE), that normally do not significantly affect the human environment.  Id. §§ 1507.3(b)(2)(ii), 1508.4.  If the agency determines that an action falls into a previously adopted CE and that there are no extraordinary

circumstances rendering a normally excluded action likely to have a significant effect, id. § 1508.4, it can go forward with the action absent NEPA documentation--that is, without the need to prepare an EA or EIS, id. § 1501.4.

## 2. The Challenged CEs

Consequently, one way for federal agencies to reduce the paperwork and delays associated with agency action is to adopt more CEs, thereby eliminating the need for NEPA documentation for future categorically excluded actions. In 2003, the Forest Service did just that.  The relevant CEs for the purposes of this litigation are two CEs adopted for fire-management activities (Fire CEs) and three CEs adopted for limited-timber harvesting (Timber CEs).

a. <u>Fire CEs</u>

As part of the Healthy Forests Initiative, the Forest Service proposed and implemented two new CEs for fire-management activities.  National Environmental Policy Act Documentation Needed for Fire Management Activities; Categorical Exclusions, 68 Fed. Reg. 33,814 (June 5, 2003) (codified at Forest Service Handbook 1909.15, ch. 30, § 31.2(10)-(11) (2004)).  The first is a CE for "hazardous fuels reduction activities."[3]  Such activities,

---

3.    The complete hazardous-fuels-reduction category is as follows:

> "<u>Hazardous fuels reduction activities using prescribed fire, not to exceed 4,500 acres, and mechanical methods for crushing, piling, thinning, pruning, cutting, chipping, mulching, and mowing, not to exceed 1,000 acres</u>.  Such activities:
>
> a.  Shall be limited to areas:
>
> (1)   In the wildland-urban interface; or
>
> (2) Condition Classes 2 or 3 in Fire Regime Groups I, II, or III, outside the wildland-urban interface;
>
> (continued...)

including prescribed burning, thin the forest in an attempt to reduce fuels for ignition and thereby lower the risk and severity of wildfires.  The second is a CE for "post-fire rehabilitation activities."[4]   Such

_____

(...continued)

> b.   Shall be identified through a collaborative framework as described in 'A Collaborative Approach for Reducing Wildland Fire Risks to Communities and Environment 10-Year Comprehensive Strategy Implementation Plan';
>
> c.   Shall be conducted consistent with agency and Departmental procedures and applicable land and resource management plans;
>
> d.   Shall not be conducted in wilderness areas or impair the suitability of wilderness study areas for preservation as wilderness; and
>
> e.   Shall not include the use of herbicides or pesticides or the construction of new permanent roads or other new permanent infrastructure; and may include the sale of vegetative material if the primary purpose of the activity is hazardous fuels reduction."

Forest Service Handbook 1909.15, ch. 30, § 31.2(10).

   4.   The complete post-fire rehabilitation category
                                        (continued...)

activities occur after a wildfire and are designed to
restore affected areas to their original or improved
conditions.  By determining that these activities "do not

_____

(...continued)
is as follows:

> "<u>Post-fire rehabilitation activities,
> not to exceed 4,200 acres (such as tree
> planting, fence replacement, habitat
> restoration, heritage site restoration,
> repair of roads and trails, and repair
> of damage to minor facilities such as
> campgrounds), to repair or improve lands
> unlikely to recover to a management
> approved condition from wildland fire
> damage, or to repair or replace minor
> facilities damaged by fire</u>.  Such
> activities:
>
>      a. Shall be conducted consistent
> with agency and Departmental procedures
> and applicable land and resource
> management plans;
>
>      b. Shall not include the use of
> herbicides or pesticides or the
> construction of new permanent roads or
> other new permanent infrastructure; and
>
>      c. Shall be completed within three
> years following a wildland fire."

Forest Service Handbook 1909.15, ch. 30, § 31.2(11).

individually or cumulatively have a significant effect on the human environment and therefore normally do not require further analysis in either an environmental assessment or an environmental impact statement," 68 Fed. Reg. at 33,814, the Forest Service categorically excluded them from NEPA documentation, thus reducing their procedural burdens.

### b. Timber CEs

At nearly the same time it adopted the Fire CEs, the Forest Service proposed and implemented three new CEs for limited-timber harvesting. National Environmental Policy Act Documentation Needed for Limited Timber Harvest, 68 Fed. Reg. 44,598 (July 29, 2003) (codified at Forest Service Handbook 1909.15, ch. 30, § 31.2(12)-(14)). The first Timber CE, known as Category 12, permits the harvesting of up to 70 acres of live trees.[5] The second

---

5.   Category 12, in full, is as follows:

"Harvest of live trees not to exceed 70

(continued...)

Timber CE, known as Category 13, allows the salvage of dead or dying trees not to exceed 250 acres.[6]  The third

─────────────────────

(...continued)

  acres, requiring no more than ½ mile of temporary road construction.  Do not use this category for even-aged regeneration harvest or vegetation type conversion. The proposed action may include incidental removal of trees for landings, skid trails, and road clearing.  Examples include but are not limited to:

  a. Removal of individual trees for sawlogs, specialty products, or fuelwood.

  b. Commercial thinning of overstocked stands to achieve the desired stocking level to increase health and vigor."

Forest Service Handbook 1909.15, ch. 30, § 31.2(12).

  6. Category 13, in full, is as follows:

  "Salvage of dead and/or dying trees not to exceed 250 acres, requiring no more than ½ mile of temporary road construction.  The proposed action may include incidental removal of live or dead trees for landings, skid trails, and road clearing.  Examples include but are not limited to:

        (continued...)

Timber CE, known as Category 14, allows the harvesting of trees, also not to exceed 250 acres, to control the spread of insects and disease.[7]

_____

(...continued)

      a. Harvest of a portion of a stand damaged by a wind or ice event and construction of a short temporary road to access the damaged trees.

      b. Harvest of fire-damaged trees."

Forest Service Handbook 1909.15, ch. 30, § 31.2(13).

    7.    Category 14, in full, is as follows:

      "<u>Commercial and non-commercial sanitation harvest of trees to control insects or disease not to exceed 250 acres, requiring no more than ½ mile of temporary road construction, including removal of infested/infected trees and adjacent live uninfested/uninfected trees as determined necessary to control the spread of insects or disease.</u> The proposed action may include incidental removal of live or dead trees for landings, skid trails, and road clearing. Examples include but are not limited to:

      a. Felling and harvest of trees infested with southern pine beetles and immediately adjacent uninfested trees to control expanding spot infestations.

      (continued...)

14

It appears that the Timber CEs are not formally a part of the Healthy Forests Initiative. However, the Timber CEs implement similar goals and policies as the Fire CEs. For instance, "[e]xamples of projects that could be implemented under Category 12 include thinning of overly dense stands of trees to improve the health and vigor of the remaining trees." 68 Fed. Reg. at 44,598. In Category 13, the CE "allows salvage harvest in areas where trees have been severely damaged by forces such as fire, wind, ice, insects, or disease and still have some economic value as a forest product." Id. And, in Category 14, the CE "allows the agency to apply harvest methods to control insects and disease before they spread to adjacent healthy trees." Id. Thus, like the Fire CEs, the Timber CEs implemented the Forest Service's

_____

(...continued)

        b. Removal and/or destruction of infested trees affected by a new exotic insect or disease, such as emerald ash borer, Asian long horned beetle, and sudden oak death pathogen."

Forest Service Handbook 1909.15, ch. 30, § 31.2(14).

goals of (1) thinning those areas of the forests most vulnerable to fire and disease in an effort to fortify their general health, and (2) improving the efficiency of such actions by reducing their administrative burdens such as NEPA documentation.[8]  Again, by determining that these activities "do not individually or cumulatively have a significant effect on the human environment and therefore normally do not require further analysis in either an environmental assessment or an environmental impact statement," 68 Fed. Reg. at 44,598, the Forest Service categorically excluded them from NEPA documentation.

---

8.    Upon issuing the Timber CEs, the Forest Service explained that they were smaller and narrower in scope than the Fire CEs.  "Most projects [under the Fire CEs] are larger in size, and involve a combination of activities such as thinning, pruning, and prescribed burning, in addition to timber harvest.  Activities using categories 12, 13, and 14 are limited to timber harvest and therefore have a more narrow application."  68 Fed. Reg. 44,599.

C. Notice, Comment, and Appeal Procedures

Another significant procedural change available to the Forest Service in furtherance of the Healthy Forests Initiative was the promulgation of new rules governing the notice, comment, and administrative-appeal procedures for Forest Service actions. These regulations were issued pursuant to the Forest Service Decision Making and Appeals Reform Act (ARA), Pub. L. 102-381, § 322, 106 Stat. 1419 (1992) (codified at 16 U.S.C. § 1612 (note)). The court will first describe the history and content of the ARA, followed by a description of the Forest Service's new procedural rules pursuant to that statute.

## 1. The ARA

Prior to the enactment of the ARA, there was no statutory requirement that the Forest Service provide a system of administrative appeals for agency actions. Idaho Sporting Congress, Inc. v. U.S. Forest Service, 843 F.Supp. 1373, 1375 (D. Idaho 1994) (Ryan, J.). Instead,

the Forest Service had provided such a system through its own regulations.  Id.  In 1992, concerned that the administrative appeal process had become too burdensome, the Forest Service proposed new regulations that would do away with administrative appeals for most Forest Service project-level decisions.[9]  Review of and Comment on National Forest Plans and Project Decisions, 57 Fed. Reg. 10,444 (Mar. 26, 1992).

Alarmed by the prospect that project-level decisions of the Forest Service would no longer be subject to administrative appeal, Congress enacted the ARA.  106 Stat. 1419.  The ARA requires the Forest Service to promulgate administrative regulations establishing notice, comment, and appeal procedures for "actions of the Forest Service concerning projects and activities

---

9.   The new rules would have retained administrative appeals for 'plan'-level decisions.  In the Forest Service, plans provide broad, long-term guidelines for forest management, whereas projects are specific actions that implement a plan.  See Sierra Club v. Robertson, 28 F.3d 753, 758 (8th Cir. 1994) (discussing the difference between a plan and a project).

18

implementing land and resource management plans." Pub. L. 102-381, § 322(a). The statute provides for public notice of proposed actions, id. § 322(b)(1); a 30-day comment period following publication of notice, id. § 322(b)(2); a 45-day right of appeal for any person involved in the comment process, id. § 322(c); and, except in an emergency, an automatic stay of the agency's action or decision for the 45-day period during which it can be appealed, id. § 322(e).

## 2. The Appeal Rule

In addition to relieving the Forest Service of administrative burdens under NEPA, the Healthy Forests Initiative sought to simplify the administrative appeal procedure. See Healthy Forests at 14 ("The appeals process is complex, time consuming and burdensome."); U.S. Forest Service, Healthy Forests Initiative Fact Sheet, Release No. FS-0177.03 (2003) (discussing plans to amend the Forest Service's administrative appeal rule),

19

_available at_ http://www.fs.fed.us/projects/hfi/May-2003/
docs/admin-fact-sheet.pdf.  The Forest Service therefore
promulgated new procedural regulations implementing the
ARA.  Notice, Comment, and Appeal Procedures for National
Forest System Projects and Activities (Appeal Rule), 68
Fed. Reg. 33,582 (June 4, 2003) (codified at 36 C.F.R.
pt. 215).[10]

The new Appeal Rule exempts several types of agency
action from the notice, comment, and appeal requirements
of the ARA, two of which are relevant here.  First, all
actions categorically excluded from NEPA documentation
are also excluded from the ARA, 36 C.F.R. § 215.4(a),
even though in the old rule a timber harvest CE had been
subject to the ARA, _see_ 58 Fed. Reg. at 58,911
(previously codified at 36 C.F.R. § 215.3(b) (1994)).
Second, all decisions issued by the Secretary of

---

10.  For the previous rule, implemented directly
after the ARA was enacted, see Notice, Comment, and
Appeal Procedures for National Forest System Projects and
Activities; Requesting Review of National Forest Plans
and Project Decisions, 58 Fed. Reg. 58,904 (Nov. 4,
1993).

Agriculture or Undersecretary for Natural Resources and
Environment are exempt from the ARA.    36 C.F.R.
§ 215.20(b).

The Appeal Rule also places restrictions on who may
comment and who may appeal.  According to the rule, the
Forest Service need only consider "substantive" comments
during the comment period.    <u>Id</u>.  §  215.6(b)(1).
Furthermore, only those persons who submitted
"substantive" comments during the comment period are
eligible to appeal.  <u>Id</u>. §§ 215.6(a)(3)(iii), 215.13(a),
215.16(a)(6).

The Appeal Rule makes several other changes that, in
the Forest Service's view, would help reduce the
administrative burdens of the notice, comment, and appeal
process.  For instance, the Appeal Rule defines the term
"emergency" to include "substantial loss of economic
value to the Federal Government," <u>id</u>. § 215.2,
potentially augmenting the category of decisions that
need not be stayed pending appeal, <u>see</u> Pub. L. 102-381,

§ 322(e).  The Appeal Rule also allows the Forest Service
official responsible for an action to "[d]etermine the
most effective timing" for the 30-day notice and comment
period, 36 C.F.R. § 215.5(a)(2), thereby permitting the
agency to begin the notice and comment period early in
the decisionmaking process for some actions and later in
the process for others.

### D. Instant Litigation

In 2003, following the Forest Service's promulgation
of new rules in connection with the Healthy Forests
Initiative, Wildlaw filed the instant action alleging a
wide array of statutory violations.  The 11 counts of
Wildlaw's amended complaint can be generally classified
as follows.  First, Wildlaw claims that the Forest
Service violated NEPA's documentation and analysis
requirements by issuing the Fire CEs, the Timber CEs, and
the Appeal Rule without properly seeking public input and
without preparing either an EA to determine whether the

22

issuance of those regulations would significantly affect the quality of the human environment or an EIS to report such effects.   Second, Wildlaw claims that the Forest Service violated NEPA in adopting the Fire CEs and the Timber CEs because actions falling into those CEs do significantly affect the human environment.   Third, Wildlaw claims that various parts of the Appeal Rule violate the ARA and that at least one part of the Appeal Rule was issued without providing the public with adequate notice.

The Forest Service denies these claims.   It also argues that Wildlaw lacks standing to bring this suit, and that its claims are not ripe for adjudication.


## II. STANDARDS OF REVIEW

### A. The Arbitrary-and-Capricious Standard

Challenges to agency action under NEPA are governed by the arbitrary-and-capricious standard as set forth in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 375-76 (1989); North Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1538 (11th Cir. 1990). Under the Administrative Procedure Act, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

As its terms suggest, the arbitrary-and-capricious standard is a deferential one. Fund for Animals, Inc. v. Rice, 85 F.3d 535, 541 (11th Cir. 1996). The court is not permitted to substitute its own judgment for that of the agency. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); Skinner, 903 F.2d at 1539.

However, the court must also "look beyond the scope of the decision itself to the relevant factors that the agency considered." Sierra Club v. U.S. Army Corps of Engineers, 295 F.3d 1209, 1216 (11th Cir. 2002) (citing

24

State Farm, 463 U.S. at 43).  The court must ensure that "agency decisions are founded on a reasoned evaluation of the relevant factors." Marsh, 490 U.S. at 378 (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)).  To do so, the court must review the entire administrative record.  Army Corps, 295 F.2d at 1216.  Its duty is to ensure that the agency took a "hard look" at the relevant factors, but not to scrutinize the wisdom of the decision itself.  33 Wright & Koch, Federal Practice & Procedure § 8335, at 175 (2006).  Agency action should be set aside as arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." State Farm, 463 U.S. at 43; see also Army Corps, 295 F.3d at 1216.

In other words, judicial review of agency action must by "searching and careful," but "the ultimate standard of review is a narrow one."   <u>Marsh</u>, 490 U.S. at 378; <u>see also</u> <u>Skinner</u>, 903 F.3d at 1538.   The arbitrary and capricious standard will govern this court's review of Wildlaw's allegations that the Forest Service violated NEPA.

## B. <u>Chevron</u> Deference

When, as is the case here, the court is called upon to review an agency's interpretation of a statute that the agency is responsible for administering, the standard of review is governed by a two-step test articulated in <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984).   <u>Sierra Club v. Johnson</u>, 436 F.3d 1269, 1274 (11th Cir. 2006).

> "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the

> unambiguously expressed intent of
> Congress. If, however, the court
> determines Congress has not directly
> addressed the precise question at issue,
> the court does not simply impose its own
> construction on the statute, as would be
> necessary in the absence of an
> administrative interpretation. Rather,
> if the statute is silent or ambiguous
> with respect to the specific issue, the
> question for the court is whether the
> agency's answer is based on a
> permissible construction of the
> statute."

Chevron, 467 U.S. at 842-43 (footnotes omitted).

Should the court determine that the statute is silent
or ambiguous, the Chevron standard of review is further
refined at step two. If the statute contains an express
delegation of authority to the agency to fill in a gap
left by the statute, then the agency's gap-filling
regulation must be upheld unless it is "arbitrary,
capricious, or manifestly contrary to the statute." Id.
at 844. If, on the other hand, the statute's delegation
to the agency is merely implicit, then the court "may not
substitute its own construction of a statutory provision

for a reasonable interpretation made by the administrator of an agency." Id.

This two-step standard of review, known as Chevron deference, governs the court's review of the Forest Service's interpretation of the ARA. As it turns out, see infra Subsection III.A.2.b., there is ultimately no need to apply Chevron deference in this case, as the court's consideration of the merits of the Appeal Rule is foreclosed by its ripeness analysis.


C. The No-Set-of-Circumstances Standard

The parties are in some disagreement over whether review in this case should involve an additional measure of deference because Wildlaw has challenged the facial validity of the Forest Service's regulations. When administrative regulations are challenged on their face, rather than as applied, the court must apply the 'no-set-of-circumstances' test to the challenge. Reno v. Flores, 507 U.S. 292, 301 (1993) (holding that a facial challenge

to an administrative regulation can succeed only if "'no set of circumstances exists under which the regulation would be valid'" (quoting United States v. Salerno, 481 U.S. 739, 745 (1987) (brackets omitted))).  Thus, the Forest Service argues that the regulations challenged in this case cannot be set aside unless all possible applications of the regulation would be invalid.  Def. Br. at 16, 48.  Wildlaw disagrees and argues that the no-set-of-circumstances test should not apply to this case. Pl. Reply Br. at 11-16.

The court agrees with the Forest Service that this case presents facial challenges and that Reno v. Flores is controlling.  However, in the context of a NEPA challenge, the no-set-of-circumstances test is not as strong a defense as the Forest Service would have one believe.  Where the agency is under an obligation to comply with a statute in a certain way before issuing a regulation, then the agency's procedural noncompliance renders the regulation illegal from day one regardless of

how, or whether, it is applied.  Thus, if an agency is required to prepare an EIS and fails to do so, then the plaintiff's no-set-of-circumstances burden is met because the 'invalidity' of all applications of the regulation flows from the agency's NEPA violation in having promulgated it without first preparing an EIS.  Waiting to see whether the regulation could be validly applied, when it was not validly promulgated in the first place, would be nonsensical.

Likewise, the facial validity of an agency's CEs relates back to the evidence available to the agency at the time the decision to adopt the CE was made.  <u>See</u> <u>Overton Park</u>, 401 U.S. at 420 (directing the district court to base its review on the full administrative record before the agency at the time the agency decision was made).  Under NEPA, as enforced through the Administrative Procedure Act, a CE is valid if the record supports the agency's determination that it describes a class of actions that do not significantly affect the

human environment.  <u>Heartwood, Inc. v. U.S. Forest Service</u>, 73 F.Supp.2d 962, 975 (S.D. Ill. 1999) (Gilbert, J.) (evaluating the record to determine if the Forest Service made its decision to adopt a CE based on adequate evidence and consideration of the relevant factors).  If the agency decision is not supported by the record, then the plaintiff's no-set-of-circumstances burden is met because the invalidity of all applications of the CE flows from the agency's NEPA violation in having unjustifiably adopted it.  Again, there would be little point in waiting to see whether the CE would be validly applied when it was not validly adopted in the first place.

Thus, just as plaintiffs who mount a facial challenge to a regulation on grounds that no EIS was prepared need not demonstrate that the regulation would still be invalid had an EIS in fact been issued, plaintiffs who mount a facial challenge to a CE on grounds that it is unsupported by the record need not demonstrate that <u>all</u>

actions falling into the CE significantly affect the human environment.  To insist otherwise overstates, and misinterprets, the significance of <u>Reno v. Flores</u>.[11]

Consequently, the no-set-of-circumstances rule is significant in this case primarily in regard to Wildlaw's claims that certain provisions of the Appeal Rule violate the ARA.  There, in addition to applying <u>Chevron</u> deference, the court must consider whether the challenged

_____

11.  Consider an analogous scenario in the context of a facial challenge to a statute, rather than an administrative regulation.  The <u>Reno v. Flores</u> holding derives directly from <u>Salerno</u>, where the court held that in order to prevail in a facial challenge to a statute, a plaintiff must establish that "no set of circumstances exists under which the [a]ct would be valid."  481 U.S. at 745.  But no one would suggest, and the Supreme Court has never implied, that <u>Salerno</u> would be of any consequence in a case where the <u>procedures</u> used to enact a federal statute did not comply with, say, the presentment clauses of the Constitution.  <u>Cf</u>. <u>INS v. Chadha</u>, 462 U.S. 919 (1983).  Plaintiffs challenging such a statute would automatically meet the no-set-of-circumstances test, because no set of circumstances exists under which a federal statute enacted in violation of the presentment clauses would be valid.  Analogously, in the context of a facial challenge to an administrative regulation, no set of circumstances exists under which a regulation adopted using <u>procedures</u> noncompliant with NEPA or the Administrative Procedure Act would be valid.

portions of that regulation could be validly applied.  If there are circumstances under which a challenged provision, when applied, would not violate the ARA, then that regulation must be upheld.  As it turns out, <u>see infra</u> Subsection III.A.2.b., there is ultimately no need to apply the no-set-of-circumstances test to the Appeal Rule in this case, as the court's consideration of the merits of the Appeal Rule challenge is foreclosed by its ripeness analysis.

### III. DISCUSSION

### A. Justiciability

Before turning to the merits of Wildlaw's claims, the court must resolve two justiciability issues raised by the Forest Service: standing and ripeness.  The court cannot adjudicate this case on the merits if it finds either that Wildlaw lacks standing to bring this suit or that its claims are not ripe for adjudication.

## 1. <u>Standing</u>

The court has an obligation, at the outset of a case, to assure itself that the plaintiff has standing. <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 180 (2000); <u>Ouachita Watch League v. Jacobs</u>, 463 F.3d 1163, 1169 (11th Cir. 2006). The constitutional standing doctrine is a product of the case-or-controversy requirement of Article III. <u>Elk Grove Unified Sch. Dist. v. Newdow</u>, 542 U.S. 1, 11 (2004); <u>Sierra Club v. Johnson</u>, 436 F.3d 1269, 1275 (11th Cir. 2006). A plaintiff must demonstrate Article III standing in order to invoke the jurisdiction of a federal court. <u>DaimlerChrysler Corp. v. Cuno</u>, ___ U.S. ____, ____ & n.3, 126 S.Ct. 1854, 1861 & n.3 (2006).

There are three fundamental elements of standing under Article III:

> "First, the plaintiff must have suffered an 'injury in fact'--an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a

**34**

> causal connection between the injury and
> the conduct complained of--the injury
> has to be fairly traceable to the
> challenged action of the defendant, and
> not the result of the independent action
> of some third party not before the
> court.  Third, it must be likely, as
> opposed to merely speculative, that the
> injury will be redressed by a favorable
> decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61

(1992) (internal quotation marks, ellipses, brackets, and

footnote omitted); see also Ouachita Watch League, 463

F.3d at 1170.  These three requirements are commonly

labeled injury, causation, and redressability.

In an environmental suit, by far the most significant

standing requirement is the 'injury in fact' element.

Ouachita Watch League, 463 F.3d at 1170. The relevant

injury is not injury to the environment, but injury to

the plaintiff.  Friends of the Earth, 528 U.S. at 181.

"[E]nvironmental plaintiffs adequately allege injury in

fact when they aver that they use the affected area and

are persons 'for whom the aesthetic and recreational

values of the area will be lessened' by the challenged

activity." <u>Id</u>. at 183 (quoting <u>Sierra Club v. Morton</u>, 405 U.S. 727, 735 (1972)).  But environmental plaintiffs must show that the environmental damage they complain of <u>directly</u> affects their recreational, aesthetic, or economic interests; mere general averments and conclusory allegations are inadequate under Article III.  <u>Friends of the Earth</u>, 528 U.S. at 183-84 (citing <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990)).

Furthermore, plaintiffs may demonstrate 'injury in fact' by claiming a 'procedural injury'--that they were injured by the defendant's violation of a procedural rule.  In order to succeed under the 'procedural injury' doctrine, a plaintiff must demonstrate that "the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing," <u>Defenders of Wildlife</u>, 504 U.S. at 573 n.8, and that it is "reasonably probable" that the procedural violation will in fact threaten that interest, <u>Ouachita Watch League</u>, 463 F.3d at 1170.  For example, if

an agency fails to prepare an EIS prior to taking an action that concretely affects the plaintiff's interests, the plaintiff has standing "even though he cannot establish with any certainty" that the EIS, had it been issued, would have prevented the action from occurring. Defenders of Wildlife, 504 U.S. at 572 n.7.  See Johnson, 436 F.3d at 1277; Ouachita Watch League, 463 F.3d at 1171 ("It is well settled that, in a NEPA suit, a cognizable procedural injury exists when a plaintiff alleges that a proper EIS has not been prepared when the plaintiff also alleges a 'concrete' interest--such as an aesthetic or recreational interest--that is threatened by the proposed actions." (internal quotation marks and ellipses omitted)).

Based on the foregoing principles, the court concludes that the Wildlaw plaintiffs have constitutional standing to bring this lawsuit.  First, the 'injury in fact' requirement of Article III standing is satisfied. Wildlaw's complaint, coupled with declarations it

submitted with its brief, demonstrate that the plaintiff organizations' members have aesthetic and recreational interests in the wellbeing of our Nation's forests.[12] They frequently visit lands regulated by the Forest Service, and they have specific, concrete plans to continue doing so in the immediate future.[13]   Cf.

---

12. Vaughan Decl. at ¶¶ 5, 9 ("I greatly enjoy the biological diversity, continuity, and harmony of the natural ecosystems of the National Forests.... I regularly participate in a wide range of recreational activities in the National Forests.... I have educational, moral, spiritual and recreational interests in the National Forests that are the subject of this lawsuit."); Tidwell Decl. at ¶¶ 4, 5, 8 ("The National Forests provide me with a much-needed escape from the modernized world. ... I have found places of solitude, beauty, and diversity in the National Forests.... The continued existence of the rare ecological communities and sensitive species here, such as old-growth forest remnants, native flora and wildlife is of the greatest importance to me. ... I have educational, moral, aesthetic, and recreational interests in the National Forests....").

13. Vaughan Decl. at ¶¶ 5, 9 ("I have hiked, bird watched, studied plants and animals, photographs, fished, camped, and otherwise enjoyed the recreational and aesthetic resources of lands in several National Forests.... I wish to be able to continue these activities ... in the future, and I plan to do so. ...
(continued...)

<u>Defenders of Wildlife</u>, 504 U.S. at 564 (finding that "'some day' intentions ... do not support a finding of ... 'actual or imminent' injury"). They fear that the challenged regulations, if not invalidated, will directly impact their ability to use and enjoy their favorite sites.[14]  The plaintiff organizations even participate in the public comment and administrative appeal processes

_____

(...continued)
Indeed, I currently have plans to return to the Bankhead National Forest this weekend, April 2-4, 2004, to photograph the wildflowers that are now blooming there."); Tidwell Decl. at ¶ 4 ("I have plans to tour the Fishlake ... come spring snowmelt.").

14.  Vaughan Decl. at ¶¶ 9-10 ("My favorite areas in the National Forests are in the Bankhead and Talladega National Forests in Alabama, including areas that already have timber sales scheduled under these new regulations. ... The Forest Service's actions in approving the regulations and rules at issue in the National Forests have assured the continued destruction of the forests that I use and enjoy."); Tidwell Decl. at ¶ 7 ("The implementation of the regulations and rules at issue without compliance with the appropriate statutes will cause substantial injury to my recreational use, aesthetic enjoyment, and quest for refuge in the National Forests of Utah.").

for Forest Service actions.[15]   Thus, Wildlaw meets the
'procedural injury' standard: it alleges that the Forest
Service failed to comply with NEPA and that this
noncompliance will harm the forests and lands in which
its members take direct and personal interest.   Wildlaw
also meets the 'procedural injury' standard for its ARA
claims, because it alleges that the challenged Appeal
Rule will reduce public participation in the Forest
Service's administrative decisionmaking and review
processes, which will in turn harm the forests and lands
in which its members take an interest.

The Forest Service's arguments to the contrary are
unavailing.   The Forest Service states that Wildlaw
asserts only "generalized grievances" and cannot point to
any concrete, particularized injury it suffered as a
result of the CEs and Appeal Rule. Def. Br. at 3-5; Def.
Reply Br. at 2-4.   Specifically, the Forest Service
refers the court to <u>Region 8 Forest Service Timber</u>

_____

15.   Vaughan Decl. at ¶ 2; Tidwell Decl. at ¶ 2.

Purchasers Council v. Alcock, 993 F.2d 800 (11th Cir. 1993), in which the Eleventh Circuit Court of Appeals held that a trade association did not have standing under the 'procedural injury' doctrine merely because the Forest Service's alleged procedural violations injured the plaintiff's rights to "information, participation, and informed decision making."  993 F.2d at 810.

But in Region 8, unlike in this case, the plaintiffs failed to identify an injury to a "separate concrete interest" as required by Defenders of Wildlife, 504 U.S. at 572 n.7.  Region 8, 993 F.2d at 810-11.  In Region 8, it was not the case that "the failure to follow a mandated procedure caused a distinct injury."  Id. at 810 n.16.  In contrast to the appellate court in Region 8, this court is satisfied that the procedural violations do threaten a separate concrete interest: Wildlaw's members' aesthetic and recreational interests in the very forests and lands that stand to be affected by the challenged regulations.

It is not necessary that Wildlaw point to a particular instance of environmental degradation. The procedural requirements of NEPA and the ARA are designed to protect Wildlaw's concrete interests; it is reasonably probable that agency action by the Forest Service in violation of those requirements will injure said concrete interests. The injury-in-fact element of standing is therefore established. See Earth Island Institute v. Ruthenbeck, 459 F.3d 954, 960-61 (9th Cir. 2006) (concluding that environmental plaintiffs have standing for their ARA challenge); Heartwood, Inc. v. U.S. Forest Service, 230 F.3d 947, 951-52 (7th Cir. 2000) (same, where plaintiffs challenged CEs under NEPA).

The causation and redressability elements are met as well. "Once ... a plaintiff has established injury in fact under NEPA, the causation and redressability requirements are generally more relaxed." Ouachita Watch League, 463 F.3d at 1172. If the Forest Service violated NEPA and the ARA, then it is clear that the Forest

Service caused Wildlaw's alleged injury.  And if the court finds for Wildlaw, it is empowered to order injunctive relief--the injury, then, is redressable.  <u>See</u> <u>id</u>. at 1173.  In sum, Wildlaw has standing to bring this suit.[16]

─────────────────────

16.  The Forest Service does not challenge Wildlaw's standing under the prudential, or nonconstitutional, standing doctrine, and it is clear that the prudential requirements are met. "A plaintiff wishing to establish standing under the [Administrative Procedure Act] must show that there has been a final agency action adversely affecting it and that, as a result, it suffers a legal wrong or that its injury falls within the 'zone of interests' of the statutory provision that the plaintiff claims was violated." <u>Ouachita Watch League</u>, 463 F.3d at 1173 (citing <u>Nat'l Wildlife Fed'n</u>, 497 U.S. at 882). Here, the Forest Service's adoption of new CEs and promulgation of the Appeal Rule were both final agency actions under the Administrative Procedure Act; and Wildlaw's alleged procedural and environmental injuries are within the zone of interests NEPA and the ARA were designed to protect.

There is also no dispute as to the Wildlaw plaintiffs' standing to bring this suit as organizations rather than as individuals. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim nor the relief requested requires the participation of individual members in the lawsuit." <u>Friends of the Earth</u>, 528 U.S. at 181; <u>see</u>
(continued...)

## 2. <u>Ripeness</u>

In addition to challenging Wildlaw's standing to bring this suit, the Forest Service contends that Wildlaw's claims are not ripe for adjudication. As the Eleventh Circuit has noted, ripeness and standing are often conflated, as both doctrines require that the injury complained of be imminent. <u>Wilderness Soc'y v. Alcock</u>, 83 F.3d 386, 390 (11th Cir. 1996). The difference is that the standing inquiry focuses on whether the plaintiff is a proper party to bring suit, whereas the ripeness inquiry focuses on "whether this is the correct <u>time</u> for the complainant to bring the action." <u>Id</u>. Accordingly, the court will now assess whether the timing of the instant litigation "causes justiciability problems." <u>Id</u>.

---

(...continued)
also <u>Ouachita Watch League</u>, 463 F.3d at 1170. Wildlaw meets these criteria.

The ripeness doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." <u>Reno v. Catholic Soc. Servs., Inc.</u>, 509 U.S. 43, 57 n.18 (1993).  As the Supreme Court has stated many times, the purpose of the ripeness doctrine is"to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." <u>Abbott Labs. v. Gardner</u>, 387 U.S. 136, 148-49 (1967), <u>quoted in</u>, <u>e.g.</u>, <u>Nat'l Park Hospitality Ass'n v. Dep't of the Interior</u>, 538 U.S. 803, 807-08 (2003), and <u>Ohio Forestry Ass'n, Inc. v. Sierra Club</u>, 523 U.S. 726, 732-33 (1998); <u>see also</u> <u>Ouachita Watch League</u>, 463 F.3d at 1174.  "To decide whether an issue is ripe for judicial review, courts will examine both the fitness of the issue for judicial decision and

the hardship on the parties if a court withholds consideration." <u>Ouachita Watch League</u>, 463 F.3d at 1174 (citing <u>Abbott Labs.</u>, 387 U.S. at 149); <u>see also</u> <u>Ohio Forestry Ass'n</u>, 523 U.S. at 733.

### a. <u>NEPA Claims (Counts 1-6) Are Ripe for Adjudication</u>

With respect to Wildlaw's NEPA claims, the court concludes that those counts are ripe for adjudication. In <u>Ohio Forestry Association</u>, the Supreme Court observed that because NEPA "guarantees a particular procedure, not a particular result[,] ... a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." 523 U.S. at 737; <u>see also</u> <u>Ouachita Watch League</u>, 463 F.3d at 1174. Once a NEPA violation takes places, there is nothing that can make the issue more 'fit' for judicial review.

The Forest Service suggests that the Ohio Forestry Association dicta be limited to Wildlaw's first set of NEPA claims, those that allege the Forest Service violated NEPA by not preparing an EA or EIS before adopting the new CEs and promulgating the Appeal Rule. Def. Reply Br. at 5-7.  The Forest Service contends that Wildlaw's second set of NEPA claims--those alleging that the CEs violate NEPA because they describe actions that significantly affect the human environment--are substantive, not procedural.  Therefore, the Forest Service argues, the court should wait until these CEs are actually applied--at which point they either will or will not significantly affect the human environment--before deciding whether they violate NEPA.  Id. at 7.

The flaw in this argument is that the Forest Service mischaracterizes the second set of NEPA claims as "substantive" rather than procedural.  As previously explained, supra Section II.C., the relevant NEPA inquiry under the Administrative Procedure Act is whether its

**47**

action was supported by the record before it at the time the decision was made, <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 420 (1971), and whether the agency, in making its decision, considered all the relevant factors, <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983). The court need not wait until the Forest Service applies the CEs to specific projects, because whether particular projects actually have a significant affect on the human environment is not the proper inquiry. Thus, even Wildlaw's second set of NEPA challenges are properly deemed procedural, not substantive, because the question is whether the Forest Service followed the correct procedures--that is, considered the relevant factors, and drew conclusions supported by the administrative record then before it--before it adopted the new CEs. These claims, like the first set of NEPA claims, are ripe for adjudication: they "can never get riper." <u>Ohio Forestry Ass'n</u>, 523 U.S. at 737.

48

The Eleventh Circuit has considered a similar question and rejected the defendants' ripeness challenge. In Ouachita Watch League, the district court had distinguished between two types of NEPA challenges much the same way as the Forest Service has here. The district court had found that a claim alleging an agency's failure to prepare an EIS or EA was a procedural violation instantly ripe for adjudication, whereas a claim alleging an agency's failure to take a "hard look" at the environmental consequences of its action was a substantive claim and therefore not instantly ripe. Ouachita Watch League, 463 F.3d at 1174 (citing Cattanooga Conservancy v. Jacobs, 373 F.Supp.2d 1353, 1370-71 (N.D. Ga. 2005) (Evans, J.)). The Court of Appeals, however, rejected that distinction. Id. at 1174-75. "The courts have been very clear that NEPA imposes a procedural duty upon the agencies to take a hard look at the environmental consequences of their actions." Id. at 1174.

Here, the situation is no different. The
Administrative Procedure Act requires that the court
scrutinize the agency's decisionmaking process, not the
decision itself. <u>See</u> 33 Wright & Koch, <u>Federal Practice
& Procedure</u> § 8335, at 175 (2006). NEPA requires that
agencies take a "hard look" at the relevant factors
before adopting a CE. Therefore, Wildlaw's claims that
the Forest Service did not do so are ripe for
adjudication.

### b. <u>ARA Claims (Counts 7-11) Are Not Ripe for Adjudication</u>

With respect to Wildlaw's ARA claims, however, the
court reaches the opposite conclusion. Wildlaw's
challenge to the Appeal Rule is a facial challenge to
regulations the Forest Service promulgated pursuant to
the ARA, regulations that set forth procedures for
notice, comment, and appeal of Forest Service plans and
projects, but do not actually implement the plans and
projects themselves. In <u>Ohio Forestry Association, Inc.</u>

v. Sierra Club, 523 U.S. 726 (1998), the Supreme Court
held that a challenge to a Forest Service plan, as
opposed to a specific project implementing a plan, was
not ripe for adjudication.   And in National Park
Hospitality Association v. Department of the Interior,
538 U.S. 803 (2003), the Supreme Court considered a
facial challenge to an administrative regulation of the
Department of Interior and held that it was not ripe for
adjudication.

This court concludes that Wildlaw's ARA claims are
sufficiently like the plaintiffs' forest-plan challenge
in Ohio Forestry Association and facial challenge in
National Park Hospitality Association to warrant
dismissal on ripeness grounds.   See also Catholic Soc.
Servs., 509 U.S. at 57 (holding that INS regulations
implementing alien legalization legislation are not ripe
for review until applied); Nat'l Wildlife Fed'n, 497 U.S.
at 891 ("[A] regulation is not ordinarily considered the
type of agency action 'ripe' for judicial review under

51

the [Administrative Procedure Act] until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.").[17]

In <u>Ohio Forestry Association</u>, the Supreme Court first examined the hardship on the parties if a court withholds consideration.   523 U.S. at 733.   Noting that the challenged forest plan does not "command anyone to do anything or to refrain from doing anything," <u>id</u>. at 733, and that additional administrative action must take place before the complained-of injury could occur, <u>id</u>. at 734, the Court found that the plaintiffs would have "ample opportunity later to bring its legal challenge at a time

_____

17.  Wildlaw cites <u>Whitman v. Am. Trucking Ass'n</u>, 531 U.S. 457, 479 (2001), as a case where the Supreme Court found a facial challenge to an administrative regulation ripe for review. In <u>Whitman</u>, however, the plaintiffs had invoked a "special judicial-review provision" of the Clean Air Act that "specifically provides for 'preenforcement' review." 531 U.S. at 479 (citing 42 U.S.C. § 7607(b)). The ARA contains no such provision.

when harm is more imminent and more certain," id.  The
Court next considered whether immediate judicial review
would hinder the agency's ability to refine its policies,
and found that the administrative notice, comment, and
appeal procedures that would accompany project-level
decisions allowed for the possibility that the agency
could correct any statutory violations before injury
occurred.  Id. at 735-36.  Lastly, the Court considered
whether it would benefit from further factual
development.  The Court concluded that "the focus that a
particular logging proposal could provide," id. at 736,
would "'significantly advance our ability to deal with
the legal issues presented,'" id. at 737 (quoting Duke
Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S.
59, 82 (1978)).

     The Supreme Court made similar observations, and drew
similar conclusions, in National Park Hospitality
Association.  The Court noted that the administrative
regulations under review were little more than a general

statement of policy, 538 U.S. at 809, publicly announcing the position the agency would take in future disputes, id. at 810.   The regulations did not affect the plaintiff's primary conduct, id., leading the Court to conclude that "'no irremediably adverse consequences flowed from requiring a later challenge,'" id. (quoting Toilet Goods Ass'n, Inc., v. Gardner, 387 U.S. 158, 164 (1967) (brackets omitted)).   The Court additionally stated that, although the challenged regulations were "final agency action" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704, "judicial resolution of the question presented here should await a concrete dispute" concerning a particular application of the rule.   538 U.S. at 812.

Ohio Forestry Association and National Park Hospitality Association strongly suggest that Wildlaw's ARA claims are not ripe for adjudication.[18]   The Appeal

18.   For an Eleventh Circuit case that pre-dates Ohio Forestry Association but addresses essentially the same issue (and reaches the same conclusion), see
(continued...)

Rule establishes procedures for future rulemaking: it purports to govern the notice, comment, and appeal process for future agency actions.  The Appeal Rule, although "final agency action" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704, is not itself an action that "command[s] anyone to do anything or to refrain from doing anything," Ohio Forestry Ass'n, 523 U.S. at 733; the Forest Service must take additional action--the designation of a specific project governed by the Appeal Rule--before the alleged injury can occur, see id. at 734.  Admittedly, the Appeal Rule itself cuts down on the amount of administrative process that must occur in order for allegedly injurious action to take place. But Wildlaw will still have an opportunity to challenge such actions when they occur.  For example, although there will be no automatic stay under § 322(e) of the ARA for actions the Forest Service designates as emergencies

_____

(...continued)
Wilderness Society v. Alcock, 83 F.3d 386 (11th Cir. 1996).

under its new, broader definition of that term, 36 C.F.R. § 215.2, Wildlaw can instead seek a temporary restraining order or preliminary injunction in federal court based on its allegation that the term "emergency," as applied, is an impermissible construction of the ARA.  The same is true for other provisions of the Appeal Rule challenged here.  In other words, the Appeal Rule does not make it impossible, or even all that difficult, to litigate an as-applied challenge; requiring the Forest Service to do so will create little hardship.  See Toilet Goods Ass'n, 387 U.S. at 164 ("no irremediably adverse consequences flow from requiring a later challenge").

In addition, further factual development, in the context of a specific-project action by the Forest Service where Wildlaw is excluded from the comment or appeal process, would help the court assess the lawfulness of the Appeal Rule.  See Duke Power Co., 438 U.S. at 82.  For example, the Appeal Rule's requirement that comments be "substantive" is a limitation that is

difficult to review outside the context of a concrete dispute.  Other provisions of the Appeal Rule are less abstract, of course, but the court would nonetheless benefit from the opportunity to place these challenges in an as-applied, fact-based context.

The Ninth Circuit Court of Appeals recently considered a facial challenge to the Forest Rule's ARA regulations and reached the same conclusion.  In Earth Island Institute v. Ruthenbeck, 459 F.3d 954 (9th Cir. 2006), the plaintiffs challenged one provision of the Appeal Rule as applied to a specific project and eight other provisions in a facial challenge.  The court held that only the as-applied challenge was ripe for adjudication.  459 F.3d at 963.  Relying primarily on Toilet Goods Association, 387 U.S. at 163-64, the court found that the regulation's effects were speculative, the record was incomplete, and the plaintiffs' primary conduct was not affected such that immediate review was warranted.  Earth Island Institute, 459 F.3d at 963.

"There is not a sufficient 'case or controversy' for us to review regulations not applied in the context of the record before this court." Id.

This court finds the Ninth Circuit's decision persuasive and also concludes that <u>Ohio Forestry Association</u> and <u>National Park Hospitality Association</u> apply here. Accordingly, because Wildlaw's challenge to the Appeal Rule is not based on its application to any particular project or action; because nothing about the Appeal Rule requires judicial intervention at this time; and because further development of a factual record in the context of an as-applied challenge would be helpful, the court finds the Appeal Rule challenge not ripe for adjudication and will dismiss those counts, 7 through 11, of the amended complaint.

## B. Merits

Now that the Forests Service's justiciability defenses have been addressed, the court at long last turns to the merits of the claims that remain. Wildlaw's remaining claims can be generally classified as follows.

First, Wildlaw claims that the Forest Service violated NEPA's documentation requirements by issuing the Fire CEs, the Timber CEs, and the Appeal Rule without preparing either an EA to determine whether the issuance of those regulations would significantly affect the human environment or an EIS to report such effects. In connection with those claims, Wildlaw also alleges that the Forest Service did not properly seek public input on the proposed regulations' environmental effects, and that the Forest Service did not properly consider the cumulative environmental effects of the challenged regulations together with other broad policy changes. These claims comprise counts 1 through 4 of Wildlaw's amended complaint.

59

Second, Wildlaw claims that the Forest Service
violated NEPA in adopting the Fire CEs and the Timber CEs
because the actions falling into those CEs significantly
affect the human environment. The question here is not
whether the adoption of CEs are among those actions that
require NEPA documentation, but whether the Forest
Service was warranted in adopting these CEs at all.
These claims comprise counts 5 and 6 of the complaint.

## 1. NEPA Claims: Lack of Analysis and Documentation

The court begins with the first set of NEPA claims.
As previously discussed, NEPA requires that the
government prepare an EIS before it undertakes any major
federal action significantly affecting the human
environment. 42 U.S.C. § 4332(2)(C). One way to avoid
preparing an EIS is for an agency to be satisfied, in one
of two ways, that the proposed action will not
significantly affect the human environment. See 40
C.F.R. § 1501.4. First, the agency can prepare an EA

and, based on the EA, issue a "finding of no significant impact." Id. §§ 1508.9, 1508.13.  Second, the agency can determine that the proposed action is described by a CE, which was previously adopted to identify actions that normally do not have individual or cumulative significant effects on the human environment.  Id. § 1508.4.  When an agency determines that a proposed action falls within a CE, it must also assess whether there are any extraordinary circumstances that render the proposed action likely to have a significant impact on the human environment despite fitting into a CE.  Id.

### a. Count 1

Count 1 of Wildlaw's amended complaint alleges that the Forest Service violated NEPA by promulgating the Fire CEs, the Timber CEs, and the Appeal Rule without preparing an EA or EIS.  This claim effectively presents the court with two separate questions.  First, is the adoption of a CE itself an action that is excluded or

61

exempt from NEPA documentation?   Second, is the
promulgation of a new rule governing the agency's notice,
comment, and appeal procedures categorically excluded as
well?   The court will first analyze this claim with
respect to the CEs, and next with respect to the Appeal
Rule.


### i. Adopting the New CEs Without an EA

The parties acknowledge that the question of whether
the Forest Service may adopt a CE without preparing an EA
or an EIS has been addressed by the Seventh Circuit Court
of Appeals in Heartwood v. U.S. Forest Service, 230 F.3d
947 (7th Cir. 2000).   In Heartwood, the plaintiffs
alleged that, in adopting a set of CEs, the Forest
Service violated NEPA by not preparing an EA or EIS to
assess the CEs' environmental impact.   The appellate
court held that NEPA documentation was unnecessary and
that no NEPA violation had taken place.

The primary reason for the court's holding is that NEPA requires documentation for only "major Federal actions," 42 U.S.C. § 4332(2)(C), and the court reasoned that the adoption of a CE is not an "action" within the meaning of the statute. "The CEs are not proposed actions, they are categories of actions for which an EA or EIS has been deemed unnecessary." Heartwood, 230 F.3d at 954. Therefore, the court held, the adoption of a CE was not subject to NEPA documentation.

Here, Wildlaw argues that Heartwood is not binding on this court; was wrongly decided; and is in any case distinguishable. The Forest Service, of course, defends the Heartwood decision and urges this court to follow it.

This court, having reviewed the applicable law and considered the parties' arguments, accepts Heartwood's general conclusion that the Forest Service can adopt a CE without preparing an EA or EIS. In doing so, however, the court believes it prudent to clarify exactly what it

thinks the Heartwood opinion means, and why it should control this case as well.

The Heartwood court reasons that the adoption of a CE is not an "action" within the meaning of NEPA, an interpretation which, at first, is difficult to accept. According to the Council on Environmental Quality regulations implementing NEPA, "Actions include ... new or revised agency rules, regulations, plans, policies, or procedures...." 40 C.F.R. § 1508.18 (emphasis added). The Council's regulations also state: "Agency procedures ... shall include ... [s]pecific criteria for and identification of those typical classes of action ... [w]hich normally do not require either an environmental impact statement or an environmental assessment (categorical exclusions (§ 1508.4))." Id. § 1507.3(b). In other words, the adoption of a CE is an agency procedure, an agency procedure is a type of agency "action," and actions are subject to NEPA analysis. It stands to reason, based on this syllogism, that the

adoption of a CE is subject to some form of NEPA analysis--either an EIS, an EA and finding of no significant impact, or identification of a preexisting CE that covers the adoption of CEs.

The Heartwood court appears to acknowledge the above definitions of "major Federal action," "procedures," and CEs, but does not conclude that they mandate treating the adoption of CEs as actions subject to NEPA analysis. 230 F.3d at 954. This court finds it difficult to believe that this is merely an oversight by the appellate court. Rather, the Seventh Circuit must have reasoned, though admittedly not explicitly, that where 40 C.F.R. § 1508.18 states that "[a]ctions include ... procedures," this does not necessarily mean that all procedures are actions. Rather, some procedures are actions within the meaning of NEPA, whereas others might not be.

There are several reasons why the adoption of CEs is not the kind of procedure covered by § 1508.18. First, the Council on Environmental Quality regulations setting

forth agency procedures do not expressly state that the agency must follow the same procedures in adopting a CE as it would in taking any other action.  <u>See</u> 40 C.F.R. § 1507.3.  The absence of any express statement in § 1507.3, which is otherwise quite detailed, could be taken to imply that the adoption of new CEs is not a procedure to which NEPA analysis applies.

Second, it would often be impractical to prepare an EA for the adoption of a CE, since the adoption of a CE does not itself authorize any particular actions that could impact the environment.  The adoption of a CE merely classifies future actions as ones that will not require an EA or EIS, barring extraordinary circumstances.  Because the Forest Service does not know when, where, how often, and under what particular circumstances the CE will be invoked for specific actions, it may not be possible to describe, with any meaningful level of specificity or reliability, how the CE will impact the human environment.  In fact, since the

66

adoption of the CE does not authorize any concrete activity, its direct impact on the human environment is likely to be nonexistent--making the preparation of an EA a bureaucratic exercise of make-work.  Therefore, given the impracticalities involved, it is easy to understand why the adoption of a CE would not be a procedure that is also a "major Federal action" within the meaning of 42 U.S.C. § 4332(2)(C).

Third, because the Council on Environmental Quality must review and approve CEs before the Forest Service adopts them, the fact that the Council has not required the Forest Service to prepare an EA before adopting CEs can be viewed as an interpretation by the Council of its own regulations that no NEPA analysis is required. Admittedly, the court is not aware of any evidence in the record to suggest that the Council has formally interpreted its regulations in this way.  However, the Council did approve the Forest Service's publication of the challenged CEs, which included its statement that

67

"the Council on Environmental Quality does not direct agencies to prepare a NEPA analysis or document before establishing agency procedures that supplement the [Council's] regulations for implementing NEPA." Fire CEs, 68 Fed. Reg. 33,814, 33,823 (June 5, 2003); Timber CEs, 68 Fed. Reg. 44,598, 44,606 (July 29, 2003). Through its silence, then, the Council has effectively adopted that interpretation of NEPA. The Council is entitled to "substantial deference" in its interpretation of NEPA's terms and of its own NEPA regulations. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 355, 359 (1989); see also Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994). Based on the Council's conduct in approving the Forest Service's adoption of the challenged CEs, the court views the Council's implicit interpretation of 42 U.S.C. § 4332(2)(C) and 40 C.F.R. §§ 1507.3(b) & 1508.18 to be that the adoption of a CE is not a major federal action requiring NEPA analysis or documentation.

68

In sum, this court concurs with <u>Heartwood</u>. The adoption of a CE is a procedure, but it is not among the procedures that constitute a "major Federal action," 42 U.S.C. § 4332(2)(C). The Forest Service's adoption of CEs is not subject to NEPA analysis or documentation. Accordingly, with respect to the Fire CEs and the Timber CEs, the court finds for the Forest Service on Count 1.

### ii. <u>Promulgating the Appeal Rule Without an EA</u>

Wildlaw also claims that the Forest Service was required to prepare an EA or EIS before promulgating the Appeal Rule. This is an easier issue to resolve because at the time the Appeal Rule was issued the Forest Service expressly stated that it fell within a preexisting CE. Appeal Rule, 68 Fed. Reg. 33,582, 33,595 (June 4, 2003). As previously discussed, once an agency determines that an action is covered by a CE and that there are no extraordinary circumstances, additional NEPA documentation is not required. Thus, the scope of this

court's review on this claim is limited to whether the Forest Service's determination that the promulgation of the Appeal Rule fell within a CE, and that there were no extraordinary circumstances, was arbitrary and capricious.

"Once an agency establishes categorical exclusions, its decision to classify a proposed action as falling within a particular categorical exclusion will be set aside only if a court determines that the decision was arbitrary and capricious." Citizens' Comm. to Save Our Canyons v. U.S. Forest Service, 297 F.3d 1012, 1023 (10th Cir. 2002); see also W. Houston Air Comm. v. FAA, 784 F.2d 702, 705 (5th Cir. 1986) ("Courts should defer to the agency's interpretation of its own categorical exclusion regulations." (internal quotation marks and brackets omitted)); City of Alexandria v. Fed. Highway Admin., 756 F.2d 1014, 1019-20 (4th Cir. 1985).  Here, the Forest Service decided to classify the Appeal Rule as falling within Category 2 of § 31.12, which excludes from

NEPA documentation "[r]ules, regulations, or policies to establish Service-wide administrative procedures, program processes, or instructions." Forest Service Handbook 1909.15, ch. 30, § 31.12(2). <u>See</u> 68 Fed. Reg. at 33,595. The Forest Service also determined that no extraordinary circumstances existed that would require an EA or EIS. <u>Id</u>.

Wildlaw argues that, in order to fall within Category 2, an action must be "routine," and that the Appeal Rule is anything but. Indeed, Category 2 is one of a set of ten CEs collectively described in the Forest Service Handbook as follows: "The following categories of <u>routine</u> administrative, maintenance, and other actions normally do not individually or cumulatively have a significant effect on the quality of the human environment...." Forest Service Handbook 1909.15, ch. 30, § 31.12 (emphasis added). There is some support in the case law for Wildlaw's argument that actions in Category 2 must be "routine." In <u>People ex rel. Lockyer v. U.S. Dep't of</u>

Agriculture, 459 F.Supp.2d 874 (N.D. Cal. 2006) (Laporte,

M.J.), appeal docketed, No. 06-16810 (9th Cir. Oct. 2,

2006), the court set aside a rule the Forest Service

sought to exclude from NEPA documentation under Category

2.  "However else one might describe the [challenged]

[r]ule," the court stated, "it is hardly routine."  459

F.Supp.2d at 901.  According to the Lockyer court, then,

actions must be routine in order to fit within Category

2.

However, there is much to distinguish the Appeal Rule

from the rule challenged in Lockyer.  The Lockyer rule,

though procedural, was implemented to rescind and replace

a substantive rule that limited road construction in

forest areas.  Id. at 879-82.  The Forest Service had

promulgated the previous, substantive rule after issuing

an EA and an EIS, whereas it sought to promulgate the

challenged procedural rule under the CE for rules and

regulations.  Id.  Given this background, the court

concluded that "to apply this categorical exclusion to an

agency action that repeals a major set of environmental protections nationwide in scope and substitutes a less protective regime that for the first time encourages state-by-state management of <u>national</u> forests stretches the categorical exclusion well past the breaking point." <u>Id</u>. at 902.  Notably, the court drew a contrast between the challenged rule, which it declared was "hardly routine," <u>id</u>. at 901, and "more routine matters," <u>id</u>. at 902, such as "clarification of appeal procedures," <u>id</u>. n.6.

Admittedly, if asked to characterize the challenged Appeal Rule, this court might not choose to describe it as a 'routine' action.  But 'routine' is also a somewhat flexible concept, and it is certainly the case that the Forest Service revises its administrative comment and appeal procedures from time to time.  <u>See, e.g.</u>, Notice, Comment, and Appeal Procedures for National Forest System Projects and Activities, 58 Fed. Reg. 58,904 (Nov. 4, 1993); Appeal of Decisions Concerning the National Forest

System, 54 Fed. Reg. 3342 (Jan. 23, 1989).  Unlike the
rule set aside by the <u>Lockyer</u> court, the Appeal Rule does
not replace a substantive rule, and it certainly
"establish[es] Service-wide administrative procedures,"
Forest Service Handbook 1909.15, ch. 30, § 31.12(2).
Additionally, while the general descriptive sentence
covering all ten CEs in § 31.12 is of some importance in
determining their scope and definition, the description
of Category 2 itself--which does not use the word
"routine"--is definitive.   Under the deferential
standards for reviewing an agency's interpretation of a
CE and its decision to place an action within a CE, this
court cannot conclude that the Forest Service's
interpretation and decision in this case were arbitrary
and capricious within the meaning of the Administrative
Procedure Act.[19]

---

19.  The court notes that it is in agreement with the
district court in <u>Oregon Natural Res. Council Fund v.
Goodman</u>, 382 F.Supp.2d 1201, 1205-06 (D. Or. 2004)
(Hogan, J.), which held, under a preliminary-injunction
standard, that the Forest Service did not violate NEPA in
(continued...)

Additionally, the Forest Service's determination that no extraordinary circumstances existed that would require NEPA documentation was not arbitrary and capricious.  The Forest Service Handbook lists several conditions the agency should consider in determining whether extraordinary circumstances exist, and none clearly applies to the Appeal Rule.[20]  In fact, since the Appeal

_____

(...continued)
categorically excluding the Appeal Rule from NEPA documentation under Category 2.

    20.  The Forest Service Handbook provides:

        "Resource conditions that should be considered in determining whether extraordinary circumstances related to the proposed action warrant further analysis and documentation in an EA or an EIS are:

        a. Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species.

        b. Flood plains, wetlands, or municipal watersheds.

                                    (continued...)

75

Rule merely establishes procedural rules for administrative comments and appeals, it is exceedingly unlikely that the Appeal Rule itself would have a significant effect on the human environment. Rather, the specific projects that might be appealed pursuant to the Appeal Rule could have significant effects, but it would be those projects, not the Appeal Rule itself, that would be subject to NEPA documentation.[21]  **Cf**. **Kleppe v. Sierra**

---

20. (...continued)
    c.    Congressionally    designated
    areas, such as wilderness, wilderness
    study  areas,  or  national  recreation
    areas.

    d. Inventoried roadless areas.

    e. Research natural areas.

    f.    American    Indians    and    Alaska
    Native religious or cultural sites.

    g.    Archaeological    sites,    or
    historic properties or areas."

Forest Service Handbook 1909.15, ch. 30, § 30.3(2).

21.  It is for this reason that the court must reject Wildlaw's argument that, because the challenged regulations are "controversial," they must be analyzed in
(continued...)

<u>Club</u>, 427 U.S. 390, 402 n.14 (1976) (observing that NEPA requires an EIS for "specific action of known dimensions").  Therefore, the Forest Service was justified in determining that no extraordinary circumstances exist.  The Appeal Rule's classification as categorically excluded from NEPA documentation does not violate NEPA.  Accordingly, the court finds for the Forest Service on Count 1 in its entirety.

------------------

(...continued)

an EA or EIS.  Pl. Br. at 12.  Although the "degree to which the effects on the quality of the human environment are likely to be highly controversial" is a consideration in determining whether an action significantly affects the environment and therefore requires an EIS, 40 C.F.R. § 1508.27(b)(4), courts have held that controversy means a "substantial dispute about the size, nature, or effect of the major Federal action rather than the existence of opposition to a use."  <u>Blue Mountains Biodiversity Project v. Blackwood</u>, 161 F.3d 1208, 1212 (9th Cir. 1998) (internal quotation marks and brackets omitted); <u>see also Georgia River Network v. U.S. Army Corps of Engineers</u>, 334 F.Supp.2d 1329, 1338 (N.D. Ga. 2003).  Here, the controversy over the Appeal Rule is properly understood as controversy over the environmental impacts of future projects that would be unreviewable under the Appeal Rule, not the direct environmental impact of the Appeal Rule itself.  Thus, although there is opposition to the Appeal Rule, this is not the kind of controversy that would require the Forest Service to prepare an EIS.

### b. Count 2

Count 2 of Wildlaw's amended complaint alleges that the Forest Service violated NEPA by failing to prepare an EA and develop an evidentiary record before concluding that an EIS was not required for the issuance of the Fire CEs, the Timber CEs, and the Appeal Rule.  Although the precise wording of Count 2 differs somewhat from Count 1, the court can discern no substantive difference between the two counts.  Accordingly, for the reasons already provided in the previous subsection of this opinion, the court finds for the Forest Service on Count 2.

### c. Count 3

Count 3 of Wildlaw's amended complaint claims that the Forest Service violated NEPA by not adequately involving the public in its development of the Fire CEs, the Timber CEs, and the Appeal Rule.  Specifically, NEPA regulations require a process known as "scoping."  40 C.F.R. § 1501.7 ("There shall be an early and open

process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action. This process shall be termed scoping.").

Wildlaw acknowledges that the Council on Environmental Quality's regulations themselves require scoping only when an EIS is to be prepared. However, the Forest Service has "broadened the concept [of scoping] to apply to all proposed actions," Forest Service Handbook 1909.15, ch. 10, § 11, at 7, including actions that are categorically excluded from NEPA documentation, see, e.g., National Environmental Policy Act Documentation Needed for Limited Timber Harvest, 68 Fed. Reg. 1026, 1028 (Jan. 8, 2003) ("The Forest Service conducts scoping on all proposed actions, including those covered by categorical exclusions."). Wildlaw asserts that the Forest Service violated its own regulations by not conducting proper scoping when issuing the challenged CEs and Appeal Rule.

Scoping describes a broad range of activities, much of which does not involve public participation.

> "Scoping is an integral part of environmental analysis. Scoping includes refining the proposed action, determining the responsible official and lead and cooperating agencies, identifying preliminary issues, and identifying interested and affected persons. The results of scoping are used to identify public involvement methods, refine issues, select an interdisciplinary team, establish analysis criteria, and explore possible alternatives and their probable environmental effects."

Forest Service Handbook 1909.15, ch. 10, § 11, at 7. Notably, the Forest Service recognizes that scoping is also a flexible process:

> "Because the nature and complexity of a proposed action determine the scope and intensity of the required analysis, <u>no single technique is required or prescribed</u>. Except where required by statute or regulations, the responsible official may adjust or combine the various steps of the process outlined in this chapter to aid in the understanding of the proposed action and identified issues."

Id. (emphasis added).  Therefore, in considering whether the Forest Service issued the challenged CEs and Appeal Rule without proper scoping, the court must consider the flexibility allowed by the applicable Forest Service regulations.

The Forest Service's requirements for public involvement in the scoping process are described in § 11.52 of its Handbook, "Identify Public Participation Needs."  The responsible official is instructed to "[r]eview and consider comments and suggestions offered by interested and affected agencies, organizations, and individuals in response to listing of the action in the schedule of proposed actions."  Id. § 11.52.  That subsection of the Handbook additionally incorporates the Council on Environmental Quality's regulations requiring that listing to be published in the Federal Register, 40 C.F.R. § 1506.6(b)(2), and that agencies "[s]olicit appropriate information from the public," id. § 1506(d).  See Forest Service Handbook 1909.15, ch. 10, § 11.52.

Wildlaw contends that the Forest Service violated these scoping duties by not properly soliciting public comment on the environmental effects of the Fire CEs, the Timber CEs, and the Appeal Rule, and by not addressing citizens' requests to prepare an EA or EIS for the challenged regulations.  Pl. Br. at 40.  This court, however, is not persuaded that the Forest Service's scoping process was arbitrary and capricious.

First, each of the challenged regulations was proposed in the Federal Register with an accompanying invitation for public comment.  67 Fed. Reg. at 77,039 (proposed Fire CEs) ("Public comment is invited and will be considered in development of the final procedures."); 68 Fed. Reg. at 1026  (proposed Timber CEs) ("Public comment is invited and will be considered in development of the final directive."); Notice, Comment, and Appeal Procedures for Projects and Activities on National Forest System Lands, 67 Fed. Reg. 77,451, 77,451 (Dec. 18, 2002) (proposed Appeal Rule) ("Public comment is invited and

**82**

will be considered in development of the final rule."). Therefore, it does appear that the Forest Service solicited information from the public as required by scoping regulations.

Wildlaw emphasizes that the purpose of scoping is to generate information about the <u>environmental</u> effects of proposed actions, and that the Forest Service did not specifically invite public comments on the <u>environmental</u> effects of the proposed regulations.  In fact, Wildlaw notes that an early draft of the proposed Appeal Rule, the Forest Service did specifically invite environmental comments, only to replace that invitation with the more generic public comment invitation when the proposed rule was published.  Pl. Br. at 40.  However, this court cannot discern, in the Forest Service Handbook or elsewhere, any requirement that the agency specifically call for environmental comments, as opposed to comments generally.  Given that "no single technique is required or prescribed" for agency scoping, Forest Service

Handbook 1909.15, ch. 10, § 11, at 7, and that this court's role in reviewing agency actions is to decide whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), this court cannot conclude that the Forest Service's decision to solicit comments generally, as opposed to expressly environmental comments, violated NEPA or its regulations.

Second, Forest Service regulations require the responsible official to "[r]eview and consider comments and suggestions offered by interested and affected agencies, organizations, and individuals...." Forest Service Handbook 1909.15, ch. 10, § 11.52. There is every indication that the Forest Service did so for each challenged regulation. According to the publication of the final regulations, the agency received 25,000 comments on the Appeal Rule, 68 Fed. Reg. at 33,582, 39,000 comments on the Fire CEs, id. at 33,815, and 16,700 comments on the Timber CEs, id. at 44,599. For

the Appeal Rule and the Timber CEs, the final publication expressly stated that "[a]ll suggestions and comments have been reviewed and considered...." 68 Fed. Reg. 33,582; id. at 44,599. While the final publication of the Fire CEs did not expressly state that the Forest Service had reviewed and considered all the comments, it did provide responses to nearly 50 comments on a wide range of topics. See id. at 33,815-23. The Forest Service undeniably complied with its regulation requiring that it "[r]eview and consider comments and suggestions," Forest Service Handbook 1909.15, ch. 10, § 11.52.

Wildlaw argues that the Forest Service "failed to address numerous requests" that it prepare an EA or EIS for the proposed regulations. Pl. Br. at 40. But there is no requirement that the Forest Service individually address all public comments during the scoping period. Cf. Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 558 (1978) (noting that NEPA requires a "fully-informed and well-considered

decision," but not one with which the reviewing court ultimately agrees). In any case, the Forest Service did provide an explanation for its decision not to prepare NEPA documentation.  For the Fire CEs and Timber CEs, the agency stated its position that NEPA analysis was not required for the adoption of new CEs.  68 Fed. Reg. at 33,823; id. at 44,606.   (This court rejects that position, see supra Subsection III.B.1.a.i, but the Forest Service did state it.)  And for the Appeal Rule, the agency determined that NEPA documentation was unnecessary because the rule fell within a preexisting CE.  68 Fed. Reg. at 33,595.  Thus, although Wildlaw was not satisfied with the agency's ultimate decision not to prepare NEPA documentation, the agency did receive, consider, and reject its requests that an EA or EIS be prepared.

In sum, the Forest Service did not fail in its public-participation and scoping requirements under NEPA, the Council on Environmental Quality's regulations, or

its own Handbook.  Accordingly, the court finds for the Forest Service on Count 3 of Wildlaw's amended complaint.

### d. Count 4

In Count 4, Wildlaw claims that the Forest Service failed to consider the cumulative impact of the challenged regulations in deciding not to prepare NEPA documentation.  Wildlaw places a good deal of emphasis on this claim, as the instant litigation challenges a series of regulatory changes brought about at roughly the same time.  The Fire CEs and the Appeal Rule were part of a more comprehensive policy known as the Healthy Forests Initiative; the Timber CEs, while not formally a part of the Healthy Forests Initiative, pursued many of the same goals.  According to Wildlaw,

> "What the Forest Service has done is try to segment its rewriting of the agency's entire regulatory structure into smaller parts, each of which they claim are insignificant by themselves.  Thus, they attempt to avoid NEPA compliance on each portion and on the cumulative whole.

...

> "The [challenged] rules are part of a
> fundamental change in Forest Service
> policy, either as part of the Healthy
> Forests Initiative or part of a broader-
> scale regulatory revolution of how the
> public's National Forests are managed.
> As such, these new regulations and rules
> cannot be viewed through a microscope,
> in isolation of the policy changes in
> front of the Forest Service."

Pl. Br. at 5, 41.

Even if the three challenged sets of regulations would not individually require NEPA documentation, Wildlaw asserts, the challenged regulations taken together, along with several other proposed regulatory changes that were not individually challenged in this case,[22] have a significant effect on the human environment and thus require preparation of an EIS.  By not preparing

-----

22.  Specifically, Wildlaw points to the proposed rule excluding forest plans from NEPA documentation, <u>see</u> National Forest System Land and Resource Management Planning, 67 Fed. Reg. 72,770 (Dec. 6, 2002), and the proposed rule reducing the need for special use authorizations, which typically require NEPA documentation, for certain projects, <u>see</u> Land Uses; Special Uses Requiring Authorization, 68 Fed. Reg. 2948 (Jan. 22, 2003).

NEPA documentation for any of these rules, "the Forest Service will have made NEPA virtually disappear from its entire decision-making process."  Id. at 45.

Wildlaw's concern, evidently, is that the Forest Service is excluding so many categories of action from NEPA documentation, and additionally exempting this increasing number of categorically excluded actions from the administrative appeals process, that the overall reduction in NEPA documentation and administrative appeals will itself have a significant effect on the human environment.  This significant effect will evidently occur even if the challenged rules, considered on their own, do not have a significant effect.

NEPA regulations do require that agencies consider the cumulative impacts of their actions.  See, e.g., 40 C.F.R. § 1508.4 ("Categorical exclusion means a category of actions which do not individually or cumulatively have a significant effect on the human environment."); id. § 1508.27(7) ("Significance exists if it is reasonable to

anticipate a cumulatively significant impact on the environment."). A cumulative impact is defined as the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." Id. § 1508.7.

However, the cumulative-analysis requirement is necessarily limited by the practical need to consider only the cumulative effects of actions that are related to one another in some way. See City of Oxford v. FAA, 428 F.3d 1346, 1353 (11th Cir. 2005) ("NEPA requires a federal agency to analyze the cumulative impacts of a proposed project in conjunction with any other, related actions." (emphasis added)). On the one hand, NEPA wisely prohibits an agency from dividing an environmentally significant action into many individually insignificant actions, thereby circumventing NEPA's documentation requirements. Id.; see also 40 C.F.R.

§ 1508.27(b)(7).   On the other hand, it would be impractical to require that an agency analyze the cumulative impact of <u>all</u> its actions put together, when those actions have little to do with one another, and particularly when such an analysis would be so generalized and speculative as to yield no useful or detailed information.   For example, there is no EIS on, say, the Bush administration, or the federal budget.   <u>See</u> <u>Dep't of Transportation v. Public Citizen</u>, 541 U.S. 752, 767 (2004) (stating that "whether and to what extent to prepare an EIS [is determined] based on the usefulness of any new potential information to the decisionmaking process.").

In order to apply practical limitations to the cumulative-impact requirement, the Eleventh Circuit Court of Appeals refers to NEPA's purposes and goals.[23]

---

23.   The Forest Service would have this court apply the "interdependence" test of <u>Airport Neighbors Alliance</u> <u>v. United States</u>, 90 F.3d 426, 430 (10th Cir. 1996). Def. Br. at 22.   The Eleventh Circuit disapproves of that test.   <u>City of Oxford</u>, 428 F.3d at 1355 n.22.   This (continued...)

Agencies are "to conduct the NEPA process with a view to the purposes underlying NEPA." City of Oxford, 428 F.3d at 1354.  NEPA serves two purposes:

> "First, it ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts. Second, it guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."

Id. (citing Public Citizen, 541 U.S. at 768, and Robertson, 490 U.S. at 349) (internal quotation marks and brackets omitted).  To the extent a cumulative-impact analysis would not further these goals, it is unwarranted.  Cumulative impacts must be "sufficiently concrete for the agency to gather information useful to itself and the public."  Id. at 1353-54.  For example, the cumulative-impact analysis for a proposed airport

_____

(...continued)
court, therefore, bases its analysis on the purpose-of-NEPA test described in City of Oxford.

renovation need not include speculative impacts such as the future relocation of a nearby road or construction of a new terminal building.  Id. 1354.

In this case, the "cumulative impact" of the challenged rules, combined with other general policy changes implemented by the Forest Service, is not "sufficiently concrete for the agency to gather information useful to itself and the public."  Id. at 1353-54.  Although Wildlaw is understandably concerned that the combination of the Fire CEs, the Timber CEs, the Appeal Rule, and other policy changes associated with or similar to the Healthy Forests Initiative will have detrimental long-term effects on the environment, those effects are too speculative, remote, and generalized to document in an EIS.  The challenged rules, even considered cumulatively with other broad policy changes in the Forest Service and Department of Agriculture, would not be directly responsible for affecting the environment, as they are primarily procedural devices for

reducing the documentation and appeals in <u>future</u> actions. Instead, at most, the future actions themselves will impact the environment. But, as it is impossible to know now what those future actions will be, it is also impossible to gauge their impact on the environment with any meaningful level of specificity. "This result contravenes the NEPA purposes of providing the agency and the public with accurate and relevant information." <u>Id</u>. at 1356.

The essence of Wildlaw's argument is that the specific projects the Forest Service is now able to pursue without NEPA documentation and without administrative appeals will combine to have a significant cumulative effect on the environment, even though the regulations challenged today do not, on their own, have such an effect. But Wildlaw must wait until those projects are specifically proposed or undertaken before that argument is ripe, and their cumulative impact

concrete enough to be analyzed in an EIS.[24]  Accordingly,

the court finds in favor of the Forest Service on Count

4 of Wildlaw's amended complaint.

---

24.  This court also finds the language of <u>Kleppe v. Sierra Club</u>, 427 U.S. 390 (1976), instructive, even though <u>Kleppe</u> was written before the current NEPA regulations were issued.  <u>See</u> <u>City of Oxford</u>, 428 F.3d at 1355 n.22 (noting that the NEPA regulations were promulgated in 1978).  In <u>Kleppe</u>, the Court recognized that a "comprehensive impact statement may be necessary in some cases ... when several proposals for []related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency...."  427 U.S. at 409-10.  However, the Court cautioned,

> "The determination of whether a comprehensive impact statement is necessary requires the weighing of a number of factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility.  Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies."

<u>Id</u>. at 412.  Here, the Forest Service has more or less taken the position that both the aforementioned factors weigh against cumulative-impact analysis, <u>see</u> Def. Br. at 21-23, and this court cannot say that such a decision was arbitrary, <u>Kleppe</u>, 427 U.S. at 412, 413.

## 2. <u>NEPA Claims: Remaining Counts</u>

The court now turns to the second set of NEPA claims. Here, Wildlaw alleges that the Forest Service violated NEPA by adopting CEs covering actions that significantly affect the human environment.  Unlike the first set of NEPA claims, which focus on the lack of NEPA analysis and documentation in adopting the CEs, this second set of NEPA claims alleges that the Fire CEs and Timber CEs are unlawful, regardless of whether they are adopted following NEPA analysis and documentation, because they do not describe actions that normally do not individually or cumulatively have a significant effect on the human environment.  <u>See</u> 40 C.F.R. §§ 1507.3(b)(2)(ii), 1508.4.

The court's role in this lawsuit is not to answer the substantive question of whether actions described by the challenged CEs actually have a significant effect on the environment.  <u>State Farm</u>, 463 U.S. at 43.  Rather, judicial review under the arbitrary and capricious standard of the Administrative Procedure Act, 5 U.S.C.

§ 706(2)(A), is limited to a "searching and careful" inquiry into whether the Forest Service's "decisions are founded on a reasoned evaluation of the relevant factors." Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989). To that end, the court must review the entire administrative record and determine whether, based on the evidence available to the Forest Service at the time it adopted the CEs, that decision was arbitrary and capricious. Overton Park, 401 U.S. at 420.

### a. Count 5: Fire CEs

The court will first address Wildlaw's challenge to the Fire CEs. There are two Fire CEs: Category 10 and Category 11. Category 10 excludes "[h]azardous fuels reduction activities using prescribed fire, not to exceed 4,500 acres, and mechanical methods for crushing, piling, thinning, pruning, cutting, chipping, mulching, and mowing, not to exceed 1,000 acres." Forest Service Handbook 1909.15, ch. 30, § 31.2(10). Category 11

excludes "[p]ost-fire rehabilitation activities, not to exceed 4,200 acres..., to repair or improve lands unlikely to recover to a management approved condition from wildland fire damage, or to repair or replace minor facilities damaged by fire." Id. § 31.2(11).

Before proposing the Fire CEs, the Forest Service reviewed over 2500 past fuels-reduction and rehabilitation projects and assessed whether those activities had a significant environmental effect.  The review covered all such projects conducted by the United States Forest Service in 2001 and 2002, all such projects conducted by the Department of the Interior in 2002, and a 10 % random sample of Department of Interior projects from 1998 to 2001.  In addition to reviewing the NEPA documentation (usually EAs) prepared for each project, the Forest Service conducted post-implementation review on the vast majority of the projects to follow up on the predictions of the NEPA analyses.  Only 12 projects in the review, out of 2500, had significant environmental

effects.  Based on this review, the Forest Service determined that the activities defined in the Fire CEs would not individually or cumulatively have a significant effect on the human environment.  See  68 Fed. Reg. at 33,814, 33,817.

The court has reviewed the administrative record for the challenged Fire CEs.  Keeping in mind that its role is to ensure that the agency considered the relevant factors and made a reasoned decision based on the information before it, the court cannot conclude that the adoption of the Fire CEs was arbitrary and capricious. This is not to deny that Wildlaw identified some evidence in the record that supports its position and uncovered some questionable methodological decisions in the Forest Service's review of past projects.  But Wildlaw's critique, while not totally without merit, do not establish that the Forest Service's opposite conclusion is unwarranted.  At the end of the day, neither Wildlaw nor this court is charged with determining whether

activities covered by the challenged CEs will have significant effects on the environment. That is the Forest Service's job, and this court cannot say that the Forest Service's decision was arbitrary and capricious.

The court is satisfied the Forest Service took a "hard look" at the relevant factors by conducting what is by all accounts an exhaustive review of past projects and their effects on the environment. The administrative record reveals that the Forest Service reviewed projects of varying sizes, in different regions, using various methods of hazardous fuel reduction and post-fire rehabilitation. See Administrative Record Doc. Nos. (AR) 133, 155. The vast majority of these projects--all but 12--were found to have no significant environmental effects. AR 155. The Forest Service's decision that the activities covered by the Fire CEs would not normally have significant effects on the human environment is a reasoned conclusion drawn from the data available at the time the challenged CEs were adopted.

Wildlaw's arguments against the Fire CEs essentially take four forms.  First, Wildlaw asserts that the administrative record affirmatively demonstrates that actions covered by the Fire CEs will have significant effects on the environment.  Second, Wildlaw argues that the Forest Service failed to consider relevant scientific literature and research.  Third, Wildlaw challenges the scientific and statistical validity of the Forest Service's review of past projects.  Fourth, Wildlaw claims the Fire CEs are overbroad.

### i. Comments in the AR Supporting Wildlaw's Position

Wildlaw's first challenge to the Fire CEs points to parts of the administrative record that support its position rather than that of the Forest Service.  The Forest Service received approximately 39,000 comments addressing its proposed Fire CEs.  A number of these comments, of course, opposed the CEs, some strenuously. See AR 2.  For example, Wildlaw points to a number of

comments stating that actions covered by the CEs would damage wildlife habitats, that temporary road construction has significant environmental effects, and that dragging logs through the forest (a by-product of thinning) is environmentally damaging.

These comments, however, do little to discredit the Forest Service's review of 2500 past projects, which suggests just the opposite. This court's role is not to weigh the evidence. The Forest Service is entitled to rely on its own data and expert opinion thereof. <u>Florida Manufactured Hous. Ass'n, Inc. v. Cisneros</u>, 53 F.3d 1565, 1572 (11th Cir. 1995); <u>see also</u> <u>Greenpeace Action v. Franklin</u>, 14 F.3d 1324, 1333 (9th Cir. 1992). It was certainly not arbitrary and capricious for the Forest Service to conclude that its own review of 2500 past projects carried more weight than the public comments critical of the CEs.

ii. <u>Independent Scientific Research</u>

Wildlaw also argues that the record supports its position because the Forest Service failed to consider scientific research that was brought to its attention. According to at least one comment in the record, scientific research suggests that the activities covered by the Fire CEs do have significant environmental effects.  AR 2, HF10, at 7.  The comment even lists numerous scientific articles and urges the Forest Service to consult them.  <u>Id</u>. at 7-10.

The Forest Service claims to have conducted its own extensive review of peer-reviewed scientific literature and found that the literature supported the Fire CEs.  68 Fed. Reg. at 33,814; AR 155, at 1 (stating that 153 peer-reviewed scientific publications were "synthesized").  Although the literature itself is not a part of the administrative record, the titles and some of the abstracts of the literature the Forest Service claims to have reviewed are.  AR 148, 157.  It appears that nearly

all the literature addresses whether fuel-reduction
activities are effective at preventing wildfires, not
whether they have significant effects on the environment.
See AR 148, 157; see also AR 166, at 14-15 (internal
review of draft Federal Register notice in which this
discrepancy is noted); AR 206, at 2 (same); AR 67, at 4
(same).  The court finds this troubling, because the
Forest Service claims to have reviewed scientific
literature relevant to the lawfulness of the CEs, not the
effectiveness of the actions covered by the CEs.  One of
the points of inquiry under the Administrative Procedure
Act's arbitrary-and-capricious standard is whether the
agency considered all the relevant factors.  State Farm,
463 U.S. at 43.

Admittedly, the Forest Service did consider some
relevant scientific literature.  Further review of the
administrative record reveals that the Forest Service
took note of a scientific paper, known as the Beschta
report, that was critical of certain fire management

techniques and their effects on the environment.  AR 140. The Forest Service did not ignore this paper; instead, it asked eight scientists to review the critical paper and provide the agency with feedback.  AR 141.  The reviewing scientists reported back to the agency that they disagreed with, or at least had strong reservations about, the general thesis and tone of the Beschta report. Id.  Thus, it appears that the Forest Service did not ignore all relevant scientific literature, but instead considered it and came to the conclusion, based on the opinions of its own experts, that certain critical literature was mistaken or misguided.  See 68 Fed. Reg. at 33,821.  Whether the agency's experts were correct is not the question for purposes of this litigation; this court's role is not to adjudicate a battle of the experts.  The Forest Service is entitled to rely on its own experts' opinion of scientific literature.  Florida Manufactured Housing Ass'n, 53 F.3d at 1572; Greenpeace Action, 14 F.3d at 1333.

But a scientific review of one piece of literature is not as comprehensive as the review the Forest Service claimed to have conducted in its final notice of the Fire CEs. See 68 Fed. Reg. at 33,814. Had the Forest Service relied solely on the literature listed to adopt the Fire CEs, such a basis would be inadequate. Fortunately for the Forest Service, this was not the only basis for its decision. In fact, it appears that the Forest Service's own comprehensive study of past projects, not its review of the scientific literature, was the primary basis for its determination that activities covered by the Fire CEs would not have significant effects on the environment. Although a more comprehensive review of scientific literature would strengthen the foundation for the Fire CEs, the court is not convinced that it was arbitrary and capricious for the Forest Service to focus on its own review. Cf. Northwest Motorcycle Ass'n v. U.S. Dep't of Agriculture, 18 F.3d 1468, 1475 (9th Cir. 1994) (declining to set aside agency action based on the

inadequacy of one basis for the decision when the agency primarily relied on a different and adequate basis for reaching the decision).

In sum, the court finds it disappointing and troubling that the Forest Service essentially attempted to take credit for reviewing scientific literature that was not relevant to the question of whether the activities under the Fire CEs would have significant environmental effects. Ultimately, however, the Forest Service's own review of its past projects supports its position, and the Forest Service primarily relied on its own review rather than the scientific literature. These facts weigh heavily against concluding that it was arbitrary and capricious for the Forest Service to determine that the activities described by the Fire CEs would not have significant effects on the environment.

Additionally, the Council on Environmental Quality, whose interpretations of NEPA regulations are entitled to substantial deference, Andrus, 442 U.S. at 358, has

107

emphasized that categorical exclusions are to be based on the agency's <u>experience</u>, not necessarily a review of scientific literature.   Guidance Regarding NEPA Regulations, 48 Fed. Reg. 34,263, 34,265 (July 28, 1983) ("The Council encourages the agencies to consider broadly defined criteria which characterize types of actions that, based on the agency's <u>experience</u>, do not cause significant environmental effects." (emphasis added)). Although the court finds it hard to believe the Council would not want an agency even to consider independent scientific research, this guidance does suggest that, in considering the "relevant factors," some factors may be more relevant than others.  Here, the Forest Service did not violate NEPA by basing its decision largely on its own data rather than the scientific literature in the field.

### iii. <u>The Forest Service's Study</u>

Next, Wildlaw challenges the scientific and statistical validity of the Forest Service's review of past projects.  The court will term these methodological critiques.  Again, Wildlaw carries a heavy burden.  As the Fifth Circuit Court of Appeals has remarked in the context of a challenge to shrimping regulations:

> "Although we believe appellants' challenge is not totally without merit, we are mindful that under the arbitrary-and-capricious standard, our deference to the agency is greatest when reviewing technical matters within its area of expertise, particularly its choice of scientific data and statistical methodology.  In reviewing such technical choices, we must look at the decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.  Accordingly, where, as here, the agency presents scientifically respectable conclusions which appellants are able to dispute with rival evidence of presumably equal dignity, we will not displace the administrative choice.  Nor will we remand the matter to the agency

109

> in order that the discrepant conclusions
> be reconciled."

Louisiana ex rel. Guste v. Verity, 853 F.2d 322, 329 (5th

Cir. 1988) (internal footnotes, citations, quotation

marks, and brackets omitted); see also Inland Empire

Public Lands Council v. U.S. Forest Service, 88 F.3d 754,

760 (9th Cir. 1996); Sierra Club v. Marita, 46 F.3d 606,

621 (7th Cir. 1995); Cattooga River Watershed Coalition

v. U.S. Forest Service, 93 F.Supp.2d 1246, 1249 (N.D. Ga.

2000) (O'Kelley, J.).  This court will consider whether

the Forest Service's data, and the conclusion it drew

therefrom, meet "minimal standards of rationality,"

Verity, 853 F.2d at 329.

Wildlaw's first methodological critique is that many

of the projects it reviewed were subject to an EA before

the final project was approved, which means the project

could have been adjusted to avoid potential environmental

problems detected in the EA.  Projects under the Fire CEs

will not benefit from the same environmental analysis, so

they are more likely to have environmental effects than

110

the past projects in the review.  The Forest Service responds that by using only the final projects in its review, those final projects helped set the parameters and limits of the resulting CEs.  Thus, if a fire management project was reduced in size because an EA suggested possible environmental effects from a larger project, the fact that a smaller final project was analyzed in the review would be reflected in a lower acreage limit in the Fire CE.

The court acknowledges that Wildlaw's critique has some merit, because certain post-EA adjustments are less quantitative than acreage limits and therefore would not be reflected in the Fire CEs.  For instance, if a proposed fire management activity was not reduced in size but was instead moved ten miles to the east in order to avoid an environmental impact identified in the EA, that adjustment would not be captured in the Fire CEs.  Still, the court does not consider this methodological critique so damaging as to render the Forest Service's review

useless and its conclusions irrational. The Forest Service's decision to use final projects rather than proposed projects in its project review was within its discretion.

Next, Wildlaw argues that the projects under the Fire CEs will be different from the projects in the review because the Fire CEs will encourage projects that are more expansive and complex than past projects. The court finds this argument speculative. The Forest Service was entitled to rely on a review of past projects in order to shape CEs for future projects.

Wildlaw's third methodological critique challenges the Forest Service's combination of "thinning" projects with other "mechanical methods" projects such as crushing, piling, pruning, cutting, chipping, mulching, and mowing. Forest Service Handbook 1909.15, ch. 30, § 31.2(10). Thinning involves using heavy equipment to drag logs away from the project site, whereas other mechanical treatments cause less disturbance. Wildlaw

contends that by reviewing thinning projects along with other less significant projects, the environmental effect of thinning was essentially 'diluted' in the final review.  More specifically, the median size of past thinning projects was 95 acres, but the overall acreage limit on the fuel-reduction CE is 1000 acres.  The Fire CE would permit up to 1000 acres of thinning even though most projects in the review used more mild fuel reduction methods.

The court does not believe that this critique is so powerful that the Forest Service could not have rationally relied on its review to construct the Fire CEs.  The data in the administrative record reflects that over 80 projects in the review involved thinning.  Although the <u>median</u> size of those projects was only 95 acres, the size of the thinning projects ranged from well below to well above the median, up to and over 1000 acres.  AR 82.  Given that the Forest Service reviewed a significant number of thinning projects of various sizes,

it was justified in concluding, based on its overall
review of fuel reduction projects, that a CE was
warranted.

Next, Wildlaw argues that the Forest Service
arbitrarily chose to base the acreage limit in the Fire
CEs on the 95th percentile acreage size of the past
actions reviewed.  In other words, the fuel reduction CE
is limited to projects up to 1000 acres, and only five
percent of the projects reviewed were over 1000 acres.
Wildlaw argues that this does not provide enough data to
support the categorical exclusion of projects near the
1000-acre limit, and that the Forest Service should have
chosen a lower limit for the Fire CEs based on the size
of the projects reviewed.

The court agrees with the Forest Service's
counterargument that the court should defer to the
agency's statistical expertise in this area.  The Forest
Service detected no correlation between acreage size of
the projects reviewed and environmental impacts of the

projects, and therefore decided to use an acreage limit in the CEs at the upper end of the range of the projects reviewed.  AR 155, at 11.  Given that the vast majority of projects reviewed had no environmental effects, and that the acreage limits in the CEs were somewhere within the range of projects reviewed, the court cannot conclude that the Forest Service's decision to use the 95th percentile was irrational.

Lastly, Wildlaw argues that the Forest Service should not be permitted to rely on "personal observation" by its field officers for post-implementation review.  As previously stated, the review of past projects included the NEPA documentation associated with those projects before they were implemented as well as post-implementation verification that the projects fulfilled the predictions of the NEPA documentation.  The post-implementation review came from personal observations by field staff in 63% of the projects, formal monitoring in 21%, and documentation associated with management plans

in 16%.   AR 133, at 7-8.   Wildlaw argues that it is arbitrary and capricious for the Forest Service to base its environmental analyses on the undocumented personal observations of its field officers.

The court disagrees.   In the Forest Service's study, the personal observations were used for post-implementation validation of formal NEPA analysis.   Since the projects reviewed had already been subject to more formal analysis, it is not irrational for the Forest Service to base its ultimate conclusion on the combination of formal NEPA analysis and the validation of that analysis through personal observation.

The cases cited by Wildlaw do not support the proposition that personal observations cannot be used as part of an environmental study.   In Northwest Motorcycle Assocation, 18 F.3d at 1475, the court questioned the court's conclusions based on the "personal experiences of Forest Service personnel" because the agency's personal-experience data was not included in the administrative

116

record.   And in <u>Idaho Sporting Congress v. Thomas</u>, 137 F.3d 1146, 1150 (9th Cir. 1998), the court held that "NEPA requires that the public receive the underlying environmental data from which a Forest Service expert derived her opinion." Here, in contrast to <u>Northwest Motorcycle Association</u> and <u>Idaho Sporting Congress</u>, the underlying data from each individual project's post-implementation review is a part of the administrative record.   <u>See</u> AR 132, col. AA.   Similarly, in <u>Heartwood, Inc. v. U.S. Forest Service</u>, 73 F.Supp.2d 962, 975 (S.D. Ill. 1999) (Gilbert, J.), the court rejected the challenged CEs based on the lack of <u>any</u> evidentiary support in the administrative record, not on the Forest Service's use of personal observation within a larger study.

Wildlaw's position that the Forest Service cannot adopt CEs based partly on the personal observations of its staff was recently rejected by the Tenth Circuit Court of Appeals in <u>Colorado Wild v. U.S. Forest Service</u>,

117

435 F.3d 1204, 1217 (10th Cir. 2006).  For the reasons discussed above, this court agrees with the Tenth Circuit that it was not arbitrary and capricious for the Forest Service to rely in part on personal observations.


### iv. <u>Overbreadth</u>

Wildlaw's last argument against the Fire CEs is overbreadth: the Fire CEs are defined so broadly that "[v]irtually any [a]ctivity can be [i]mplemented [u]nder [t]hem."  Pl. Br. at 76.  Specifically, Wildlaw alleges, the CE has defined 'hazardous fuels' to include virtually "all types of vegetation, living or dead," <u>id</u>.  The Fire CEs do not include any limits on how many different projects can be implemented at the same time, in the same year, or in the same region.  <u>Id</u>. at 79.  As a result, virtually "all timber sales on federal forestlands" could be covered under the CE, <u>id</u>. at 76, which would have significant individual and cumulative effects on the environment, <u>id</u>. at 77-79.

The court must reject this argument as speculative and based on a premise that the Forest Service will not implement the challenged CEs in good faith.  There are already limits on the CEs themselves, and in NEPA regulations generally, that guard against an overbroad interpretation.

First, Wildlaw's overbreadth argument is belied by the limitations written into the CEs themselves.  In addition to being limited to 1000 acres, the fuel-reduction CE:

> "a.  Shall be limited to areas:
>
> (1)  In  the  wildland-urban interface; or
>
> (2) Condition Classes 2 or 3 in Fire Regime Groups I, II, or III, outside the wildland-urban interface;
>
> "b.  Shall be identified through a collaborative framework as described in 'A Collaborative Approach for Reducing Wildland Fire Risks to Communities and Environment 10-Year Comprehensive Strategy Implementation Plan';
>
> "c.  Shall be conducted consistent with agency and Departmental procedures and

119

applicable land and resource management plans;

"d.   Shall not be conducted in wilderness areas or impair the suitability of wilderness study areas for preservation as wilderness; and

"e.   Shall not include the use of herbicides or pesticides or the construction of new permanent roads or other new permanent infrastructure; and may include the sale of vegetative material if the primary purpose of the activity is hazardous fuels reduction."

Forest Service Handbook 1909.15, ch. 30, § 31.2(10). Given these limits, it is abundantly clear that not "all timber sales on federal forestlands" could be covered by the CE.

Second, NEPA regulations do not permit an agency to divide a project into component parts in order to circumvent NEPA documentation requirements.   40 C.F.R. § 1508.27(b)(7); City of Oxford, 428 F.3d at 1353.   This would be no less permissible under a CE than it would be when the project is analyzed in an EA.   Thus, the Forest Service cannot implement numerous projects all covered

120

under the CE at the same time or in the same area without considering whether the cumulative effects of the projects would constitute extraordinary circumstances precluding the use of the CE.

Of course, there are countless 'nightmare scenarios' in which the Forest Service would wilfully use the CEs as a pretext or guise for major logging projects with significant environmental effects.  But the court cannot assume, in the context of a facial challenge and where the language of the CEs does not authorize it, that the Forest Service will violate the law or implement the CEs in bad faith.  See Sullivan v. Everhart, 494 U.S. 83, 94 (1990).  Furthermore, these "scenarios are adequately addressed by the [CEs'] requirement that the Forest Service consider whether extraordinary circumstances are present that would preclude [their] use...."  Colorado Wild, 435 F.3d at 1220.  The standard for adopting a CE is whether the record supports the agency's conclusion that the CE describes a set of actions that normally do

not have individual or cumulative significant effects on the human environment.  That standard has been met here.

Accordingly, having considered the parties' arguments and reviewed the administrative record, the court concludes that the Forest Service's adoption of the Fire CEs was not arbitrary and capricious.  The court finds for the Forest Service on Count 5.

### b. Count 6: Timber CEs

The court will now address Wildlaw's challenge to the Timber CEs.  There are three Timber CEs.  Category 12 covers the "[h]arvest of live trees not to exceed 70 acres," Forest Service Handbook 1909.15, ch. 30, § 31.2(12); Category 13 covers the "[s]alvage of dead and/or dying trees not to exceed 250 acres," id. § 31.2(13); and Category 14 covers the "[c]ommercial and non-commercial sanitation harvest of trees to control insects or disease not to exceed 250 acres," id. § 31.2(14).  All three CEs cover activity "requiring no

**122**

more than ½ mile of temporary road construction." Id. § 31.2(12)-(14).

Some additional background is helpful in understanding the origin of the challenged Timber CEs. In Heartwood v. United States Forest Serice, a federal district court in the Southern District of Illinois declared null and void a previous timber CE as a violation of NEPA because the administrative record did not support the Forest Service's determination that the CE covered actions that would not have a significant effect on the environment. 73 F.Supp.2d at 974-77. The previous CE, which had been adopted in 1992, covered live timber harvests of up to 250,000 board feet and timber salvage of up to 1,000,000 board feet. Id. at 974-75; see also National Environmental Policy Act; Revised Policy and Procedures, 57 Fed. Reg. 43,180, 43,209 (Sept. 18, 1992). The Heartwood district court noted that a pre-1992 CE had limits of 100,000 board feet for both live harvesting and salvage. 73 F.Supp.2d at 975. In

123

the new 1992 CE then being challenged, the Forest Service had, without explanation or documented evidentiary support, raised the limits to 250,000 board feet for live harvesting and 1,000,000 board feet for salvage.  Id.  The court found that an increase of this magnitude, without explanation or support, was a "classic example of an arbitrary decision."  Id.

> "The Court cannot find and the defendants do not direct the Court to any evidence in the record to support the huge increase in the board feet limit from the prior 100,000 limit, except to refer to the [Forest Service's] expertise and prior experience with timber sales having 'these characteristics.' 56 Fed. Reg. 19719.  That is not sufficient.  The [Forest Service] does not identify nor detail the characteristics to which it refers (road construction length, size of salvage or live tree harvests, etc.) and provides absolutely no other rationale to the Court to explain how and why the agency arrived at these figures.  In addition, the [Forest Service] does not provide any documentation nor evidence regarding the details of these prior harvests nor the [Forest Service's] analysis of their environmental effects upon which they based their opinion."

Id.  The district court also noted that the Forest Service's own task force report made recommendations that ran counter to the challenged CE, and that the Forest Service had failed to explain the discrepancy.  Id. at 976.  In sum, the court concluded that a CE not based on a reasoned explanation and underlying evidence in the administrative record was arbitrary and capricious.

In this case, the three challenged Timber CEs represent the Forest Service's attempt to present an evidentiary and explanatory basis for CEs that cover timber harvest and salvage.  See 68 Fed. Reg. at 1027. Before adopting the now-challenged Timber CEs, the Forest Service conducted an extensive review of 154 timber harvest projects that either were implemented under the previous timber CE before it was struck down by the Heartwood court or were similar in size and scope such that they would have been covered by the old CE.  68 Fed. Reg. at 44,602-03.  For all of the projects reviewed, the Forest Service supplemented whatever pre-implementation

NEPA analysis had been conducted with post-implementation validation of the environmental effects of the project. Id. at 44,598; AR 406 (describing the review and its methodology in more detail). For all the projects reviewed, the Forest Service found that there had been no significant environmental effects. 68 Fed. Reg. at 44,598. Based on these results, the agency developed the three Timber CEs.

The court has reviewed the administrative record for the challenged Timber CEs. Again, given that the court's role is to ensure that the agency took a "hard look" at the information before it, considered the relevant factors, and made a reasoned decision, the court cannot conclude that the adoption of the Timber CEs was arbitrary and capricious.[25] As with its challenge to the Fire CEs, Wildlaw has undeniably identified weaknesses in

---

25. Recently, one of the Timber CEs--Category 13--was upheld by the Tenth Circuit in Colorado Wild, 435 F.3d 1204. This court has conducted its own review of the administrative record and has come to the same conclusion with respect to all three Timber CEs.

the Forest Service's analysis.  But Wildlaw's critique is not so damaging as to prove that the Forest Service's decision was arbitrary and capricious.

The record reflects that the Forest Service undertook a thorough analysis of past timber harvests, reasonably determined that those projects did not significantly affect the environment, and reasonably concluded that activities covered by the Timber CEs would also not have significant effects.  Unlike in Heartwood, where the Forest Service provided no evidentiary basis for its decision to expand the CE, here the Forest Service documented 154 projects similar in size and scope to the challenged Timber CEs and found that they had no significant environmental effects.  And also unlike in Heartwood, where there was seemingly no non-arbitrary basis for the numbers the Forest Service used to limit the size of the CE, here the Forest Service used the average acreage size for the reviewed projects in each of the new categories.  In other words, the live-tree

harvest CE limit is 70 acres because the average size of the reviewed live-tree harvests was approximately 70 acres, and the salvage and sanitation CE limits are 250 acres because the average for the reviewed salvage and sanitation projects was approximately 250 acres. AR 406, at 3. The Timber CEs were therefore based on non-arbitrary, reasonable conclusions drawn from evidence before the agency at the time the CEs were adopted and now in the administrative record.

Wildlaw's arguments against the Timber CEs largely parallel its arguments against the Fires CEs, which this court has addressed generally. First, Wildlaw refers the court to statements in the administrative record that establish, in Wildlaw's view, that the challenged CEs do have significant environmental effects. The Forest Service received approximately 16,700 comments on the Timber CEs, a number of which opposed their adoption. 68 Fed. Reg. at 44,599; see AR 670. For example, Wildlaw points to a number of comments expressing concern over

the effects that the categorically excluded activities will have on wildlife, habitats, watersheds, and soil. Some comments state that all road construction, no matter how limited in size and regardless of whether it is temporary or permanent, has significant environmental effects.  Some urge the Forest Service to restrict the size of projects in terms of timber volume rather than land area, while others state that all project-size limitations are arbitrary regardless of whether they are measured in board feet or acreage.  See generally Pl. Br. at 81-93.

These individual comments, however, do not undermine the Forest Service's own review of 154 past projects, which suggests that these activities do not have significant environmental effects and upon which the Forest Service was entitled to rely.  Importantly, the Forest Service responded to many of these comments in the final notice it published in the Federal Register.  See, e.g., 68 Fed. Reg. at 44,604 (acreage limits; road

construction).  Regardless of whether the Forest Service actually made wise decisions with respect to these issues, the court cannot say that the Forest Service failed to consider the relevant factors, drew unreasonable conclusions from its review of past projects, or otherwise made decisions that were arbitrary and capricious.  The court must defer to the Forest Service's determination that its own data and review of past projects are more reliable than the comments Wildlaw highlights.

Second, Wildlaw claims that the Forest Service failed to consider relevant scientific research in reaching its conclusions.  The court shares Wildlaw's concerns to the extent that the Forest Service's record would have been stronger had it included a comprehensive review of peer-reviewed scientific literature.  But, as previously stated, the Council on Environmental Quality appears to consider the agency's own experience most relevant in its adoption of categorical exclusions.  See 48 Fed. Reg. at

130

34,265; see also Colorado Wild, 435 F.3d at 1218-19.
Additionally, the record reflects that the Forest Service
did consider and respond to some of the relevant
scientific literature in the field.  68 Fed. Reg. at
44,603 (discussing the Beschta report).  In sum, it was
not arbitrary and capricious for the Forest Service to
rely primarily on its own review of past projects.

Third, Wildlaw challenges the scientific and
statistical validity of the Forest Service's review of
154 past timber harvest projects.  As with Wildlaw's
methodological critiques of the Forest Service's project
review underlying the Fire CEs, the court finds that
these critiques have some merit but do not establish that
the Forest Service's reliance on its data, or the
conclusions it drew, failed to meet "minimal standards of
rationality," Verity, 853 F.2d at 329.

Two of Wildlaw's methodological critiques were
already addressed in its challenge to the Fire CEs.  See
supra Subsection III.B.2.a.  Wildlaw repeats its argument

131

that the 154-project review is meaningless insofar as it relied on the personal observations of Forest Service personnel. Again, the court finds that some personal observation, when properly documented and supplemental of more formal analysis, is not improper. See also Colorado Wild, 435 F.3d at 1217. Wildlaw also repeats its argument that the review is invalid insofar as many of the reviewed projects had been analyzed in EAs and thus could have been adjusted to avoid potential environmental problems detected in the EA--adjustments that will never occur under the Timber CE. Again, the court sees that there are legitimate arguments to be made both in favor of this methodology and against. It therefore must conclude that the Forest Service's decision to use final projects rather than proposed projects in its project review was within its discretion.

Three other methodological critiques remain. Wildlaw alleges that the 154-project review was not sufficiently random, and that the agency was biased in selecting

projects for review.   In fact, there is no evidence of
actual bias, and the court cannot accept that NEPA or the
Administrative Procedure Act require an agency to use
statistically random samples when conducting a review of
this sort.   Next, Wildlaw argues that the Forest Service
should have reviewed more than 154 projects, and that its
review of a small number of large projects skewed the
results to favor a larger acreage limit.   Again, the
court is not convinced that it was unreasonable for the
Forest Service to base its conclusions on a review of 154
projects.   Although the review included a smaller number
of larger projects, the conclusions drawn therefrom were
not arbitrary; the larger projects reviewed, like the
smaller ones, were not found to have a significant effect
on the environment.   Lastly, Wildlaw argues that the
post-implementation monitoring considered only whether
the projects under review had met agency standards, not
whether the projects had a significant effect on the
human environment.   However, the administrative record

133

reveals that the Forest Service actually requested that the monitor report both whether the project had met standards **and** whether it had significant effects on the human environment.   AR 349.   Therefore, the post-implementation monitoring was designed to answer many questions about the projects under review, one of which was the right question for purposes of this litigation.

Accordingly, having considered the parties' arguments and reviewed the administrative record, the court concludes that the record supports the Forest Service's adoption of the Timber CEs.   The court finds for the Forest Service on Count 6.


IV. CONCLUSION

For the foregoing reasons, the court holds as follows: Wildlaw has standing; Wildlaw's NEPA claims are ripe for adjudication but its ARA claims are not; and all NEPA claims are resolved in favor of the Forest Service.

134

An appropriate judgment will be entered.

DONE, this the 26th day of January, 2007.

＿＿＿/s/ Myron H. Thompson＿＿＿
UNITED STATES DISTRICT JUDGE